UNITED STATES, Plaintiff,

v.

DISTRICT COUNCIL OF NEW YORK CITY and Vicinity of the United Brotherhood of Carpenters and Joiners of America, et al., Defendants.

No. 90 Civ. 5722 (CSH).

United States District Court,
S.D. New York.

Sept. 12, 1996.

. Richard A. Medina, New York City, for Appellant Anthony D. Fiorino.

Bernard B. Cohen, General Counsel, New York City, Sapir & Frumpkin L.L.P., White Plains, New York (Donald Sapir, of Counsel), for Appellant District Council of New York City & Vicinity, United Brotherhood of Carpenters and Joiners of America.

Latham & Watkins, New York City (Kenneth Conboy, Geoffrey Berman, of Counsel), for Appellee.

## MEMORANDUM OPINION AND ORDER

HAIGHT; Senior District Judge:

Anthony D. Fiorino appeals from a decision of an Independent Hearing Panel, convened pursuant to the Consent Decree entered in this case, sustaining certain charges preferred against Fiorino by the Investiga-

tions and Review Officer.[1] The District Council supports Fiorino in his appeal, pursuant to a prior order of the Court granting the District Council limited standing to do so.

## I

Familiarity with the Court's prior opinions is presumed. For present purposes, it is sufficient to say that in September 1990, the government filed a civil RICO action for injunctive relief against the District Council of New York City and Vicinity of the United Brotherhood of Carpenters and Joiners of America (the "District Council") and certain of its officers. The government alleged that the individual defendants and others had engaged in a variety of forms of labor racketeering, and that the operations of the District Council and its constituent local carpenters' unions had been infected by organized crime.

During trial, the parties entered into a Consent Decree dated March 4, 1994. To implement its terms, an Investigations and Review Officer ("IRO") and a five member Independent Hearing Committee, all agreed to by the parties in the Consent Decree, were appointed. ¶ 3. The IRO has "the same right to initiate disciplinary charges against any member of the District Council and its constituent locals as has any officer or member of the District Council or its constituent members." Consent Decree, ¶ 4(b). The IRO commences a disciplinary proceeding by filing a charge in accordance with procedures set forth in the Consent Decree. Disciplinary hearings are held before a three-member Independent Hearing Panel, drawn from the five-member Independent Hearing Committee. *Id.* "The hearing shall be held under the rules and procedures generally applicable to labor arbitration hearings." ¶ 4(c). "Any decision of an Independent Hearing Panel is final and binding, subject to review by this Court.... In reviewing such decisions, the Court shall apply the same standard of review applicable to review of final agency action under the Administrative Procedure Act." ¶ 6.

In written specifications dated December 5, 1994, the IRO brought eight charges against Fiorino. These charges accused Fiorino of engaging in improper conduct, committing offenses "discreditable to the Union," or violating the Consent Decree. Each of the charges alleged that Fiorino's specified conduct transgressed provisions of the national labor laws, the By–Laws of the District Council, the Constitution of Local Union 257 (of which Fiorino was a member), or the Consent Decree. Each charge did not allege violations of all of these sources of authority. The particular charges giving rise to this appeal are quoted *supra.*

For introductory purposes, it is sufficient to say that an Independent Hearing Panel ("the Panel") conducted hearings, received evidence, considered the submissions of counsel, and rendered a decision. The Panel unanimously held that the proof sustained Charges One, Five, Six, Seven and Eight. A divided Panel upheld Charge Two. The Panel unanimously held that Charges Three and Four had not been proven. On Charges One and Two, the Panel imposed upon Fiorino the penalty of expulsion from the union for life. Varying periods of suspension were imposed for the other charges that were upheld.

Fiorino appeals from those parts of the Panel decision adverse to him. He is supported by the District Council to the extent permitted by the Court's prior orders.

## II

Fiorino and the District Council contend that the decision of the Independent Hearing Panel must be vacated because of the presence on the Panel of Alan R. Kaufman, one of the five attorneys constituting the Independent Hearing Committee.

The District Council says that it would not have agreed to Kaufman's presence on the Independent Hearing Committee if Kaufman had disclosed his legal representation of one Roger Levin, an attorney specializing in labor union matters. Fiorino and the District Council base their argument for *vacatur* of

---

**1.** Following the wording of the Consent Decree, Fiorino styles his application to this Court as a "motion to review, vacate and/or reverse" the

decision of the Panel. However, it is in effect an appeal, and for the sake of brevity will be so characterized in this Opinion.

the Fiorino decision upon Kaufman's representation of Levin. The District Council takes the proposition one step further and contends that Kaufman should be removed from the Independent Hearing Committee.

### A

The issue is an important one. I have considered all the submissions. They include the five briefs filed on this appeal; Kaufman's affirmations dated November 17, 1995 and February 12, 1996; the letter dated February 23, 1996 from Fiorino's counsel, commenting on Kaufman's second affirmation; and the letters submitted by the government dated February 8, 1996, by the District Council dated February 9, 1996, and the IRO dated March 12, 1996. Lastly, familiarity is presumed with respect to the Court's Memorandum Opinion and Order dated March 20, 1996, which rejected the District Council's contention that while the Fiorino appeal was *sub judice*, Kaufman should not sit on any other Independent Hearing Panels.

I begin the factual analysis with the two Kaufman affirmations. Fiorino and the District Council disagree with the conclusions Kaufman expresses in those submissions and the inferences he draws from them; but, with the exception of one factual assertion to which I will come, there is no basis in the record to disbelieve Kaufman's description of the timing and scope of his legal representation of Roger Levin.

Roger Levin and the law firm he controlled, Levin & Weissman, represented a number of local labor unions and their affiliated benefit funds. Those unions included the Mason Tenders District Council of Greater New York (the "Mason Tenders"); the District Council of New York City and Vicinity of the United Brotherhood of Carpenters and Joiners of America (the "District Council" that is a party in the case at bar); and the Bricklayers District Council 95 of Greater New York (the "Bricklayers"). The United States Attorney for this District charged Levin with conspiring to pay and paying monies to union officials to obtain and retain that legal work, and failing to report such payments, in violation of 18 U.S.C. §§ 371 and 29 U.S.C.A. 1023(b)(3)(D). Levin agreed

to plead guilty and signed a cooperation agreement with the United States Attorney dated September 2, 1994.

Kaufman did not represent Levin in his negotiations with the Federal government. A criminal defense lawyer named Frederick P. Hafetz did so. Kaufman's representation of Levin had begun at an earlier date.

In the summer of 1993, Levin received a grand jury subpoena from the New York Country District Attorney's office ordering him to appear and testify concerning that office's investigation into Local 2 of the Plumber's Union, its affiliated benefit plans, and one Louis Moscatiello. Levin retained Kaufman to represent him in that matter.

On August 16, 1993, at 4:00 p.m., Kaufman appeared in chambers before Judge Carey, who was supervising the grand jury. Also present were Larry Kravitz, a Levin & Weissman attorney, and Assistant District Attorney Carbone. Carbone wanted Judge Carey to rule on claims of attorney-client privilege that Levin raised during informal questioning by Carbone. Kaufman explained to Judge Carey the nature of his representation of Levin and the circumstances under which he advised Levin with respect to a possible invocation of the attorney-client privilege in the context of Levin's contacts with Local 2 of the Plumbers Union. Kaufman told Judge Carey that the Assistant District Attorney "made a decision that they were not going to apprise Mr. Levin and his counsel as to the subject matters that were going to be covered here. The only thing that we were told is that it would involve Local 2 and it would involve the industry board of the plumbers." Transcript of August 16, 1993 *in camera* hearing at JMS 9. Kaufman explained to Judge Carey that "[t]here was a bit of confusion on our part as to what relationship he was talking about, because these other relationships did exist." *Id.* at JMS 10.

Kaufman and Kravitz then left chambers and Carbone spoke with Judge Carey alone. Carbone advised the judge that "the primary area we intend to ask [Levin] about" was Levin's conversations with Moscatiello about

Local 2 of the Plumbers Union. *Id.* at JMS 16.

Accompanied by Kaufman, Levin testified before the state grand jury on August 17 and September 2, 1993. Fiorino includes in his papers on appeal several pages from Levin's grand jury testimony. Levin was asked whether he had any discussions with Moscatiello about one Vinny DiNapoli, and whether Levin had heard that Moscatiello and DiNapoli were associated with the Genovese organized crime family.

In March 1994, Kaufman accepted appointment as a member of the Independent Hearing Committee under the Consent Decree. The state case involving Levin and Local 2 of the Plumbers Union was quiescent during the rest of 1994. Levin had other problems, but other attorneys represented him with respect to them. Thus in May 1994, Levin asked the firm of Fried Frank Harris Shriver & Jacobsen to represent him in connection with a civil RICO case involving the Mason Tenders Union. As noted, Frederick Hafetz represented Levin in his negotiations with the United States Attorney. Levin's cooperation agreement with the government, negotiated by Hafetz, resulted *inter alia* in Levin submitting an affidavit dated October 24, 1994 on behalf of the government in an action it commenced in this Court against the Mason Tenders District Council of Greater New York before Judge Sweet. 94 Civ. 6487. Fiorino submits a copy of that affidavit on this appeal.

Kaufman had nothing to do with Levin's negotiations with the United States Attorney, and was not advised of the information given by Levin to the government.

In November 1994, the District Attorney's office told Kaufman that Levin would be subpoenaed to testify at the state trial of Moscatiello. In December 1994 Kaufman learned that he would be a member of the Independent Hearing Panel that would consider the charges against Fiorino. In point of fact, Kaufman chaired that Panel. The other members were Paul J. Curran and Patrick J. Barth. The Panel received evidence on March 20–23, March 28, March 30, April 5–6, April 10, and April 13, 1995. Posthearing main briefs were exchanged on May 15, 1995, and reply briefs on June 5, 1995. The Panel heard oral argument on July 6, 1995, and decided the case on September 28, 1995.

On April 24 and 25, 1995, Levin testified at the Moscatiello trial, before Justice Bernard Fried and a jury. Kaufman, representing Levin, was present in the courtroom. Fiorino submits the transcript of Levin's testimony on this appeal. It comprises pages 1101 through 1341 of the trial record.

The appellate briefs for Fiorino and the District Council focus upon testimony Levin gave about one Ralph Coppola. The IRO's first charge against Fiorino, which the Panel upheld in pertinent part, included an allegation that Fiorino "knowingly associated with members and associates of the Genovese Family, namely Liborio Bellomo and Ralph Coppola." At the Moscatiello trial, Levin explained the circumstances of his introduction to Coppola by Moscatiello, Coppola's relationship with Moscatiello, and Levin's representation of Coppola. Levin then testified that Coppola was a member of organized crime, specifically the Genovese family, and that when Levin first met Coppola, Coppola was a member of the New York City District Council of Carpenters and a shop steward at the Javits Convention Center. Tr. 1132–33.

In the light of that testimony, Kaufman can no longer sustain the statement in ¶ 9 of his November 17, 1995 affirmation that at the Moscatiello trial "[n]othing occurred which in the remotest way had anything to do with the District Council of Carpenters or with Fiorino." Kaufman deals with that statement in ¶ 8 of his subsequent February 12, 1996 affirmation:

Clearly, I was in error when I stated in my earlier affirmation that "[n]othing occurred [in the Moscatiello trial] which in the remotest way had anything to do with the District Council of Carpenters or with Fiorino." Now that I have seen a portion of the trial transcript, obviously there was some passing reference to Ralph Coppola and the Carpenters. At the time I submitted my affirmation, I had no recollection of that. I still have no recollection of it. It evidently had no significance to me. It

meant nothing in connection with the Moscatiello trial, and while I presumably recognized Coppola's name since the Fiorino hearing had concluded some eleven days earlier, it had no bearing on that matter to me. Post-hearing briefs were still to be submitted. Closing arguments were yet to come. As I recall, Coppola's status as a member or associate of organized crime was not a hotly contested issue. Indeed, it was undisputed at the Fiorino hearing that Coppola had been removed from his position as Chief Steward at the Javits Center by the District Council for being associated with organized crime.

Kaufman concludes his February 12, 1996 affirmation with these assertions:

Most importantly, it presented no conflict for me. Whatever decision the Panel was going to reach in the Fiorino matter had nothing whatsoever to do with my representation of Roger Levin. Finding against Fiorino could in no way benefit Levin. Finding for Fiorino could in no way hurt Levin. There was no connection. There was no partiality.

### B

A considerable number of cases consider the circumstances under which a factfinder, intended to be impartial, must be disqualified.

The two most fertile sources of jurisprudence are arbitration and litigation. Where an arbitration falls within the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq., the district court may vacate an arbitration award where there was "evident partiality" on the part of an arbitrator. 9 U.S.C. § 10(b). In litigation, a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a).

■ Proceedings before an Independent Hearing Panel convened pursuant to the Consent Decree do not constitute, strictly speaking, either arbitration or litigation. The briefs of counsel on this appeal cite cases derived from both areas. But I think that the arbitration context more closely resembles the proceeding at bar. The Indepen-

dent Hearing Committee was created by the parties' agreement, as expressed in the Consent Decree. The parties chose the five members of that Committee. Those circumstances more closely resemble consensual arbitration before agreed-upon arbitrators than litigation, which is entirely non-consensual and in which the identity of the trial judge depends upon the luck of the draw, rather than the parties' selection. Accordingly, I will evaluate Fiorino's challenge to Kaufman's presence on the Panel by referring to cases involving arbitration.

■ In the arbitration context, "evident partiality" under 9 U.S.C. § 10(b) does not "require proof of actual bias." The rule in the Second Circuit is that "evident partiality" exists "where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration." *Morelite Construction Corp. v. New York City District Council Carpenters Benefit Funds*, 748 F.2d 79, 84 (2d Cir.1984).

■ It follows that even if one accepts Kaufman's assertions of lack of personal partiality at face value, that is not decisive. The case turns upon whether a reasonable person would have to conclude that Kaufman was partial in favor of the IRO and against Fiorino. The test to be applied "is an objective one which assumes that a reasonable person *knows and understands all the relevant facts.*" *In re Drexel Burnham Lambert, Inc.*, 861 F.2d 1307, 1313 (2d Cir.1988) (emphasis in original), *reh'g denied*, 869 F.2d 116 (2d Cir.), *cert. denied*, 490 U.S. 1102, 109 S.Ct. 2458, 104 L.Ed.2d 1012 (1989). *Drexel* construed the judicial recusal statute, 28 U.S.C. § 455(a), but there is no principled reason not to apply the same characteristics of the reasonable person in the litigation context to his counterpart in the context of arbitration or Hearing Panel proceedings.

In the case at bar, the reasonable person that I must hypothesize is aware of the timing and scope of Kaufman's representation of Roger Levin, as revealed by the record on the appeal. That reasonable person is also able to disregard conjecture, speculation or conclusory arguments which find no support in the record.

■ I conclude that Fiorino and the District Council have failed to show that "a reasonable person would have to conclude" that, as the result of his representation of Levin, Kaufman was partial to the IRO and impermissibly inclined against Fiorino.

### C

The briefs for Fiorino and the District Council consistently exaggerate the timing and scope of Kaufman's representation of Levin. To do so, they indulge in speculation and conjecture, either unsupported by the record or at times flying in its face.

An example appears in the letter response of Fiorino's counsel to Kaufman's second affirmation. Counsel argues that Kaufman "must have reviewed that Federal cooperation agreement and had discussions with the Federal authorities and the attorney who negotiated the Federal cooperation agreement." Letter dated February 23, 1996 at 2. That argument is premised upon counsel's statement that Levin received from the state prosecutors a grant of immunity "*coextensive* with the immunity conferred upon him in his Federal cooperation agreement." *Id.* Substantial contacts between Kaufman and the Federal prosecutors might be significant if they had occurred, since the government does not disguise its interest, bordering on the avid, in the IRO's charges against Fiorino. But the Moscatiello trial record does not support Fiorino's inference. The concept of a "coextensive" immunity was raised in a question Justice Fried put to Levin in the jury's presence:

> THE COURT: I think I'm going to not need you to approach but I can just simply ask you a question.
>
> Talk to the jury. Mr. Levin, did you receive immunity in this Courthouse, this morning, which was coextensive or the equivalent of what you have received from the United States government?
>
> A. Yes.
>
> THE COURT: And that was here in this Courtroom today?

> THE WITNESS: Yes.

Tr. 1118.

While Levin testified on redirect examination that he believed he received immunity from the District Attorney's Office "only at the end of last week," Tr. 1313, there is nothing in this testimony that casts doubt upon Kaufman's assertions, more pertinent to this appeal, that he played no part in Levin's relationship with the Federal prosecutors, either before, during or after those events.

Similarly, Fiorino's reply brief at 2–3 is phrased to suggest that Kaufman participated in the entire hearing before Judge Carey prior to Levin's appearance before the state grand jury. In point of fact, as the minutes of that hearing show, Kaufman was excused from the Judge's chambers after a preliminary exchange, and the conversations of substance between the prosecutor and the judge took place in Kaufman's absence.

Fiorino's reply brief at 3 also sets forth the substance of Levin's declaration of October 24, 1994 in the Mason Tenders case pending before Judge Sweet. But Kaufman did not represent Levin in connection with that proceeding and had nothing to do with the preparation of the declaration.

The only aspect of Kaufman's representation of Levin requiring discussion is Levin's testimony at the Moscatiello trial about Ralph Coppola, which Kaufman heard because he was in the courtroom. As we have seen, Levin testified that Coppola held a position of responsibility in the District Council, worked at the Javits Convention Center (as did Fiorino), and was a member or associate of the Genovese crime family.

Fiorino and the District Council correctly observe that the IRO, to succeed on one prong of the first charge against Fiorino, bore the burden of proving that Coppola was in fact a member or associate of an organized crime family. If Coppola's status in that regard was a contested issue at the Fiorino hearing, then it could be argued that Levin's testimony about Coppola might have influenced Kaufman when he came to participate in the Fiorino decision. Arguably, in such a circumstance, Kaufman might have been pre-

disposed to accept the testimony of his client, Levin.

But this potential problem does not arise, because Coppola's organized crime membership was not a contested issue at the Fiorino hearing. Counsel for Fiorino says in his February 23, 1996 letter at 2 that "Fiorino never conceded that Coppola was a member or associate of organized crime." While that is true enough, it is of no consequence, since the Independent Hearing Panel members were aware from the hearing record that following his election as District Council president in August 1991, Frederick Devine removed Coppola from the Javits Center because the District Council regarded Coppola as a member of organized crime. *See* concurring and dissenting opinion of Panel member Patrick H. Barth at 1 (hereinafter, the "Barth Opinion") ("Ralph Coppola was removed from his position as General Steward at the Javits Center by newly elected President Frederick Devine on August 6, 1991.... Mr. Coppola was removed by the District Council because the Council concluded that he was a member of La Cosa Nostra and he knowingly associated with Liborio Bellomo, another member of La Cosa Nostra."). Indeed, throughout this litigation, the District Council has pointed to Devine's dismissal of Coppola on that ground as evidence of institutional rectitude. In short, within the context of the Fiorino hearing, Coppola's organized crime membership was a non-issue.

As far as Fiorino was concerned, the Coppola-related issues were whether Fiorino knew that Coppola was a member of organized crime, and notwithstanding that knowledge, continued to associate with Coppola. These issues turned solely upon the workings of Fiorino's mind and Fiorino's conduct. Levin knew nothing of those matters, and consequently could have communicated nothing concerning them to Kaufman.

The record on this appeal reveals that Kaufman's representation of Levin was confined to parties, events and issues not directly implicated in the Fiorino hearing; and that Kaufman learned nothing as the result of that limited representation which impaired his ability to act as an impartial member of the Fiorino hearing panel.

I think that is the conclusion that a reasonable person, with full knowledge of the relevant facts and circumstances, would inevitably reach. The indicia of partiality which Fiorino and the District Council profess to find in the record are far too attenuated and speculative.

It is instructive in that regard to contrast *Morelite Construction Corp. v. New York City District Council Carpenters Benefit Funds, supra,* with *Local 814, International Brotherhood of Teamsters v. J & B Systems Installers & Moving, Inc.,* 878 F.2d 38 (2d Cir.1989). In *Morelite* the Second Circuit vacated an arbitration award because the sole arbitrator was the son of an official of a union involved in the controversy. The court of appeals judges, casting themselves in the roles of reasonable people, said that "we are bound by our strong feeling that sons are more often than not loyal to their fathers, partial to their fathers, and biased on behalf of their fathers." 748 F.2d at 84.

The party seeking to vacate an arbitration award in *Local 814* relied upon *Morelite,* but without success. In *Local 814* the arbitration arose out of the discharge of an employee, Angelo Bracco. The arbitration board, made up of representatives of the employer and the union, included a union representative named Frank Narcisco, who had previously refused to testify before a grand jury investigating Angelo Bracco's father, James Vincent Bracco. Seeking to vacate the arbitrator's award in favor of Angelo Bracco, the employer pointed to the father-son relationship between the two Braccos, and relied upon *Morelite.* Rejecting that argument, the Second Circuit stated:

> *Morelite* applies to the issue of Narcisco's alleged partiality. There is a father-son relationship in this case, but its connection to the arbitration is more attenuated than in *Morelite.* Appellants invite us to assume that Narcisco refused to cooperate with the grand jury investigation in order to protect James Vincent Bracco and, further, that this requires us to assume that Narcisco would be biased in favor of Angelo Bracco. This is speculation that might

suffice to show an "appearance of bias," but it falls short of *Morelite's* "reasonable person" standard. Appellants have presented no other evidence that would lead us to conclude that Narcisco was partial to Angelo Bracco. In the grand jury investigation, Narcisco could have been acting to protect himself, or one of the other targets of the investigation. Even if he was protecting James Vincent Bracco, it does not necessarily follow that his loyalty toward the father would extend to the son.

878 F.2d at 40.

■ The Second Circuit's analysis in *Local 814* is instructive because it shows that even if grounds for speculation exist which might give rise to an appearance of bias, that is not sufficient to satisfy the "reasonable person" standard articulated in *Morelite*. *Morelite* requires that the demonstrated circumstance be such that "reasonable people would have to believe it provides strong evidence of partiality by the arbitrator." 748 F.2d at 85 (footnote omitted). Fiorino and the District Council have not shown such circumstances with respect to Kaufman in the case at bar.

In these circumstances, Kaufman was not required to disclose his representation of Levin, at the beginning of the Fiorino hearing or at any time thereafter.

The District Council also complains in its main brief at 11–12 that Kaufman failed to disclose his representation of Levin at the time of the selection of the five attorneys for inclusion in the Consent Decree as members of the Independent Hearing Committee. The District Council expresses concern because "it appears that the Government was aware of Mr. Kaufman's representation of Mr. Levin due to Mr. Kaufman's appearance on behalf of Mr. Levin in federal proceedings." The Consent Decree was signed on March 4, 1994. At that time, Kaufman had done no more for Levin than accompany him to the state grand jury inquiring into a different matter. He had not represented Levin in federal proceedings, and did not do so thereafter. Kaufman owed no duty of disclosure of his representation of Levin at the time of his appointment to the Independent Hearing Committee.

■ Accordingly, I reject Fiorino's contention on appeal that the decision of the Independent Hearing Panel must be vacated because of Kaufman's presence on that Panel. It follows that the District Council's renewed effort to remove Kaufman from future panels is also denied.

### III

In addition to Kaufman's presence on the Panel, Fiorino and the District Council challenge the integrity of the hearing process on two other grounds.

First, they contend that the Panel erred in failing to require certain witnesses to appear, testify, and be cross-examined, rather than receiving their affidavits into the record. A related contention is that the Panel impermissibly considered hearsay evidence.

Second, Fiorino and the District Council say that the Panel erred in determining that the IRO had the burden of establishing the charges against Fiorino by a preponderance of the evidence, rather than by clear and convincing proof, the standard that appellants contend should apply.

### A

A threshold question arises as to the scope of review this Court applies to decisions of the Independent Hearing Panel.

The Consent Decree provides at ¶ 6 that in reviewing a decision of an Independent Hearing Panel, "the Court shall apply the same standard of review applicable to review of final agency action under the Administrative Procedure Act" (hereinafter "APA").

■ Under section 10(e) of the APA, 5 U.S.C. § 706, a reviewing court determines *de novo* "all relevant questions of law." *Hanly v. Kleindienst,* 471 F.2d 823, 829 (2d Cir.1972), *cert. denied,* 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973). "Our review of questions of law is plenary." *N.L.R.B. v. Greensburg Coca–Cola Bottling Co., Inc.,* 40 F.3d 669, 673 (3rd Cir.1994). *Greensburg* arose under the National Labor Relations Act, but the scope of judicial review under that statute is no different from that under the APA. *Universal Camera Corp. v.*

*N.L.R.B.*, 340 U.S. 474, 487, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). In considering a relevant question of law under the APA, the reviewing court asks whether the agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

An agency's findings of fact "are entitled to affirmance on review if they are reasonable and supported by substantial evidence in the record as a whole." *N.L.R.B. v. Gordon*, 792 F.2d 29, 32 (2d Cir.1986). The APA "permits agency findings to be set aside only if they are 'unsupported by substantial evidence;'" *United States v. International Brotherhood of Teamsters* [2] *(Cimino)*, 964 F.2d 1308, 1311 (2d Cir.1992) (quoting 5 U.S.C. § 706(E)). "Substantial evidence is more than a mere scintilla," *Cimino* at 1311–12, but "something less than the weight of the evidence, and the substantial evidence standard may be met despite the possibility of drawing two inconsistent conclusions from the evidence." *United States v. IBT (DiGirlamo)*, 19 F.3d 816, 820 (2d Cir.) (citations and interior quotation marks omitted), *cert. denied,* —— U.S. ——, 115 S.Ct. 199, 130 L.Ed.2d 130 (1994). "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp.*, 340 U.S. at 488, 71 S.Ct. at 464. In *Consolo v. Federal Maritime Commission*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966), the Supreme Court defined substantial evidence as

> such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury. This is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.

(citations and internal quotations omitted).

▪ In the case at bar, the propriety of the method in which the hearing was con-

ducted raises questions of law that the Court will consider *de novo*. The sufficiency of the evidence against Fiorino will turn upon the substantial evidence rule.

### B

▪ Fiorino and the District Council base their objections to the procedures followed by the Panel upon a provision in the Consent Decree that such disciplinary hearings "shall be conducted under the rules and procedures generally applicable to labor arbitration proceedings." ¶ 4(c)(5). They quote various arbitration rules of procedure, a textbook, and an affidavit submitted by a "renowned arbitrator," [3] Daniel G. Collins, as support for the proposition that affidavits of witnesses not tested by cross-examination cannot constitute substantial evidence. Appellants appear to argue for a *per se* rule excluding from the record affidavits or statements from witnesses who do not appear at the hearing and undergo cross-examination.

While I consider this question *de novo*, I do not write upon a clean slate. The Second Circuit has addressed the issue within the context of a comparable consent decree entered in the IBT litigation. In *United States v. IBT (Adelstein)*, 998 F.2d 120, 124–25 (2d Cir.1993), the Court of Appeals squarely held that hearsay declarations were admissible at a disciplinary hearing, provided there were sufficient indicia of reliability. *DiGirlamo*, 19 F.3d at 823, reached the same conclusion, citing *Adelstein*, and observing: "Hearsay statements may gain reliability by corroborating one another or by including specific details." *See also United States v. IBT (Wilson, Dickens and Weber)*, 978 F.2d 68, 72 (2d Cir.1992).

The IRO says these decisions, generated by the IBT consent decree, are controlling in the case before me. I agree. The District Council protests in its Reply Brief at 20 that it "agreed to be bound by its Consent Decree, not the *Teamsters* litigation." That protest might have substance if there were material differences between the two consent decrees. However, the IBT consent decree,

---

2. Hereinafter "IBT."

3. District Council Main Brief at 10.

filed on March 14, 1989, also provides that disciplinary hearings thereunder "shall be conducted under the rules and procedures generally applicable to labor arbitration proceedings." ¶ 12(A)(e). Accordingly there is no principled basis for distinguishing these Second Circuit cases on the facts. I am bound by them as a matter of law.

The District Council argues that the Second Circuit's IBT decisions did not give sufficient consideration to labor arbitration principles. That argument must be addressed to the Court of Appeals.

## C

■ The IBT consent decree litigation has also involved the issue of whether an officer such as the IRO must prove disciplinary charges by a preponderance of the evidence, or by clear and convincing proof.·

Under the IBT consent order, the court officer performing the functions of the Independent Hearing Panel in the case at bar is called the "Independent Administrator" (hereinafter "Administrator"). Another court officer, the Investigations Officer, "is granted authority to investigate corruption and prosecute disciplinary charges against any officer, member or employee of the IBT or any of its affiliates." *United States v. IBT (Friedman and Hughes)*, 905 F.2d 610, 613 (2d Cir.1990). That is the function of the IRO in the case at bar. As does an Independent Hearing Panel in the instant case, the IBT Administrator "sits as an impartial decisionmaker in disciplinary cases brought by the Investigations Officer, conducts the disciplinary hearings and decides them." *Id.* Friedman and Hughes were "the first two IBT officials charged and tried under the remedial scheme created by the Consent Decree." *Id.* They appealed from the Administrator's decision suspending them from union office, a ruling upheld on review by the District Court.

The Second Circuit, while rejecting the government's contention that it·lacked appellate jurisdiction, *see* 905 F.2d at 615–16, concluded that "the Administrator's decisions are entitled to great deference." *Id.* at 616. The Court of Appeals based that conclusion in part on the consent decree's provisions that disciplinary hearings conducted ·by the Administrator shall be "conducted under the rules and procedures generally applicable to labor arbitration hearings"; that "[a]ny decision of the Administrator shall be final and binding," subject to the review of the district court; and that "[i]n reviewing actions of the Administrator, the Court shall apply the same·standard of review applicable to review of final agency action under the Administrative Procedure Act." *Id.* at 616. As noted, precisely the same provisions appear in the Consent Decree at bar. The Second Circuit rejected the appeal of Friedman and Hughes.

*Friedman and Hughes* turned upon a point of collateral estoppel, and did not involve an evidentiary hearing. However, in a later case, the IBT Administrator determined "that the Investigations Officer must establish just cause at disciplinary hearings by a fair preponderance of the evidence." *United States v. IBT (Salvatore)*, 754 F.Supp. 333, 337 (S.D.N.Y.1990). Salvatore argued to the district court that the application of this standard of proof was arbitrary and capricious. He contended that the stricter "clear and convincing" burden should be applied, in conformity with the by-laws of Local 191, of which Salvatore was a member.

Judge Edelstein upheld the Administrator's application of the preponderance standard. He reasoned that no provision in the consent decree or the IBT constitution, which the consent decree required the Administrator to enforce, supported Salvatore's argument. The IBT consent decree was silent on the applicable standard of proof, as is the Consent Decree at bar. Noting the broad reach of the Administrator's power articulated by the Court of Appeals in *Friedman and Hughes*, Judge Edelstein viewed the·Administrator's determination of the applicable standard of proof in disciplinary hearings as an exercise of that power, and held that Salvatore "has not demonstrated that this determination was arbitrary or capricious." *Salvatore*, 754 F.Supp. at 337.

The IBT Administrator continued to apply the fair preponderance standard in a lengthy series of hearings. *See, e.g., United States v. IBT (DiGirlamo)*, 824 F.Supp.· 410, 412

(S.D.N.Y.1993), *aff'd* 19 F.3d 816 (2d Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 199, 130 L.Ed.2d 130 (1994). While the Second Circuit's IBT decisions have not addressed the standard of proof issue as explicitly as they have the admissibility of hearsay, its affirmance of a case such as *DiGirlamo* fairly reflects the court of appeals' conclusion that court officers such as the IBT Administrator may validly apply the preponderance of evidence standard to disciplinary hearings under such consent decrees.[4] That conclusion is binding on me. I apply it to affirm the application of that standard by the Independent Hearing Panel in Fiorino's case, and to reject appellants' argument that the charges needed to be sustained by clear and convincing proof.

If I am wrong in concluding that the Second Circuit's decisions in the IBT cases are binding on me on this issue, I would reach the same result for the reasons stated by Judge Edelstein in *Salvatore.* Fiorino and the District Council cannot point to any provision in the Consent Decree or applicable union constitutions or by-laws mandating the clear and convincing standard. Such support as appellants profess to glean from texts and authorities such as Mr. Collins falls far short of demonstrating that, under the Consent Decree, the Independent Hearing Panel lacked the authority to set the standard of proof as a fair preponderance of the evidence. As a "relevant question[ ] of law" under the APA, 5 U.S.C. § 706, the appellants must show that the application of this standard to Consent Decree disciplinary hearings is arbitrary or capricious. They have not done so.[5]

The District Council's effort in that regard is made harder, not easier, by the IBT litigation, which, prior to the execution of the Consent Decree in the case at bar, had established a fair preponderance of the evidence as the applicable standard in disciplinary hearings. It would be surprising if the District Council's able and imaginative attorneys were not aware of that case law when the parties executed the decree in this case.

But I do not rest the decision on that likelihood. I hold that the Independent Hearing Panel had the authority to apply to Fiorino's hearing the preponderance of evidence standard. It follows that application of that standard does not furnish a basis for reversing the decision of the Independent Hearing Panel.

## IV

It remains to consider whether the Panel's decisions are supported by substantial evidence, as that phrase has been judicially defined by the cases cited in Part III A, *supra.*

*Charge One:*

Charge One of the IRO's presentment against Fiorino reads as follows:

> You violated Paragraph 2(b) of the Consent Decree, your Obligation to the United Brotherhood of Carpenters and Joiners of America ("Obligation"), Section 20(B) of the Addendum Supplementary Sections to the By–Laws and Working Rules of the District Council of New York City and Vicinity of the United Brotherhood of Carpenters and Joiners of America ("District Council By–Laws And Addendum"), and Article V, Section 1 of the Constitution and By–Laws of Local Union 257, by engaging in improper conduct and committing an offense discreditable to the Union,
>
> TO WIT, beginning in or around August 1991, and continuing thereafter, while a member of Local Union 257 employed at the Jacob K. Javits Convention Center (the "Javits Center"), you were acting agent of the Genovese Organized Crime Family of La Cosa Nostra at the Javits Center, and knowingly associated with members and associates of the Genovese Crime Family

4. That is consistent with the Second Circuit's articulation of a consent decree court officer's powers in *Friedman and Hughes, supra.*

5. It would be strange to conclude that an entity whose factual findings are subject to the APA scope of review acted arbitrarily or capriciously in choosing not to apply a clear and convincing proof standard, when its findings need only be supported by "substantial evidence," which under the APA may be "something *less* than the weight of the evidence," *Consolo v. Federal Maritime Commission,* 383 U.S. at 620, 86 S.Ct. at 1026 (emphasis added).

and other Crime Families of La Cosa Nostra, including Liborio "Barney" Bellomo and Ralph Coppola.

Charge One consists of two elements: Fiorino's illicit agency on behalf of the Genovese crime family, and his knowing association with Genovese family members and associates, including Bellomo and Coppola. The Panel correctly concluded that these two elements were not dependent on each other, so that proof of either would sustain the charge. The Panel held that the IRO failed to prove the first element, a finding from which the IRO does not appeal. But it sustained the second prong of the charge, finding that from August 1991, Fiorino knowingly associated with Bellomo and Coppola, members or associates of the Genovese crime family. Fiorino appeals from that finding.

The first alleged misconduct on this element is a violation of ¶ 2(b) of the Consent Decree. ¶ 2 of the Consent Decree provides in pertinent part:

2. *Permanent Injunction against Racketeering Activity.* All current and future officers, employees, and members of the District Council and its constituent locals are permanently enjoined: ...

b. from knowingly associating with any member or associate of any La Cosa Nostra crime family or any other criminal group, or with any person prohibited from participating in union affairs (hereinafter collectively referred to as "barred persons"); ...

██ Charge One also lies under Section 20B of the District Council By–Laws, and Article V, Section 1 of Local Union 257's Constitution. These documents prohibit officers or members from committing "an offense discreditable" to the union.

The IRO's theory of the case, which the Panel accepted, is that knowing association by a union member with crime figures constitutes "an offense discreditable to" the District Council and the Local, and accordingly violates the District Council By–Laws and the Local's Constitution. The IRO's brief at 19–20 defends that proposition by analogizing the governing documents at bar to the IBT's Constitution, which requires that every member "conduct himself or herself in a manner so as not to bring reproach upon the Union." IBT members who knowingly associated with crime figures were found to have violated that provision in decisions which the Second Circuit affirmed. *DiGirlamo,* 19 F.3d at 819; *United States v. IBT (Senese and Talerico),* 941 F.2d 1292, 1294 (2d Cir.1991), *cert. denied,* 502 U.S. 1091, 112 S.Ct. 1161, 117 L.Ed.2d 408 (1992).

Fiorino argues in his reply brief at 10 that the analogy is flawed because section 51(A) of the Constitution of the United Brotherhood of Carpenters and Joiners of America enumerates 14 "offenses" for which a union member may be punished, and "knowing association" with crime figures is not one of them.

I do not think that the definition of "offenses" in the Constitution of the international union precludes the Panel from holding that knowing association with organized crime figures is "discreditable" and consequently violative of the District Council By–Laws and Local 257's Constitution. Fiorino's argument, carried to its logical conclusion, would grant District Council and local union members a license to engage in knowing, open and unfettered association with organized crime figures, no matter how notorious. A reasonable observer would regard such conduct as "discreditable" to the District Council and the Local, just as knowing association with criminals was regarded as "bring[ing] reproach" upon the Teamsters Union. Indeed, in Devine's much-publicized dismissal of Coppola from the Javits Center in August 1991, one of the stated reasons was Coppola's knowing association with Bellomo, an organized crime figure. It follows that in measuring Fiorino's conduct by these provisions of the By–Laws and Constitution at bar, the Panel did not act in an arbitrary or capricious manner.

██ The remaining questions are whether substantial evidence exists in the record to sustain the Panel's findings that during the charged time period, Fiorino knowingly associated with crime figures Bellomo and Coppola. The proof concerning these two individuals must be weighed separately. The

analysis begins with the meaning of "knowing association."

An individual knowingly associates with a member or associate of an organized crime family if that individual, with knowledge of the other's crime family status, associates with him, as that concept is defined by law.

The IBT consent decree contained a prohibition identical to that quoted from ¶ 2(b) of the Consent Decree at bar. In *United States v. Local 1804–1, International Longshoremen's Association, AFL–CIO (Ciccone)*, 44 F.3d 1091, 1096 (2d Cir.1995), the Second Circuit had occasion to summarize the law generated on the point by the IBT litigation:

> The meaning of "knowingly associating" in the Teamsters decree has been litigated on several occasions and is now well established. *See United States v. International Bhd. of Teamsters (DiGirlamo)*, 19 F.3d 816, 822 (2d Cir.), *cert. denied,* — U.S. ——, 115 S.Ct. 199, 130 L.Ed.2d 130 (1944); *United States v. International Bhd. of Teamsters (Adelstein)*, 998 F.2d 120, 125 (2d Cir.1993); *United States of International Bhd. of Teamsters (Cozza)*, 764 F.Supp. 797, 801–02 (S.D.N.Y.1991) *aff'd,* 956 F.2d 1161 (2d Cir.1992). Under the decisions interpreting the Teamsters consent decree, truly incidental contacts with prohibited individuals, such as encounters at weddings and funerals, are permitted, *Teamsters (Cozza)*, 764 F.Supp. at 813 (decision of independent administrator, affirmed by district court), as are such contacts as are "required in [one's] official capacity." *Teamsters (Adelstein)*, 998 F.2d at 126. Where the contacts are the result of "a 'calculated choice' to associate with persons" of prohibited status, however, the consent decree is violated. *Teamsters (DiGirlamo)*, 19 F.3d at 822. And this is so even if there is no showing that the associations were for an improper purpose.

Fiorino cites *Ciccone* for the proposition that the Panel "was also required to determine whether said association constituted improper conduct." Main Brief at 12. There is no merit to this argument because the consent decree in *Ciccone* had different wording. The consent decree in that case prohibited Ciccone "from knowingly *and improperly* associating" with members of organized crime (emphasis added). The Court of Appeals' decision in *Ciccone* turns upon the meaning of the word "improperly," the court stating in that regard:

> any knowing association with individuals of prohibited status that has either the purpose or effect of promoting a continued organized crime influence on union affairs, or that has an intimidating or untoward effect on the operation and integrity of the union, is improper and thus prohibited by the consent decree.

44 F.3d at 1097.

In *Ciccone,* the Second Circuit pointed out that "although early drafts of the consent decree in this case contained the language from the Teamsters [IBT] decree, this language was rejected in later drafts and in the final consent decree." *Id.* at 1096. In the case at bar, the Consent Decree's language is the same as that found in the IBT consent decree. *See DiGirlamo,* 19 F.3d at 819. Accordingly, I give the same construction as in the IBT case to the phrase "knowingly associating" with members of organized crime families, and conclude that the IRO need not show "that the associations were for an improper purpose." *Ciccone,* 44 F.3d at 1096 (citing *DiGirlamo,* 19 F.3d at 822).

■ Fiorino also contends that the District Council By–Laws and Local 257's Constitution do not prohibit knowing association with organized crime figures. While these documents do not use those words, they do prohibit union members or officers from committing "an offense discreditable" to the United Brotherhood or the Local. That is the practical equivalent of the prohibition in the IBT constitution that provides sanctions against Union members who "brought reproach upon the IBT." *See DiGirlamo,* 19 F.3d at 819 n. 1. The IRO properly charged Fiorino with violations of the District Council By–Laws and the Local's Constitution, as well as violating ¶ 2(b) of the Consent Decree.

■ To sustain this Charge, the IRO had to prove that (1) Bellomo and Coppola were members or associates of an organized crime

family; (2) Fiorino had knowledge of that status; and (3) he "associated" with Bellomo and Coppola, as that word has been judicially defined. The Panel found that these facts were proved. On this appeal, Fiorino must show that the Panel's findings are not supported by substantial evidence.

While the IRO bore the burden of proving the prohibited status of Bellomo and Coppola, *Ciccone*, 44 F.3d at 1097 n. 1, Fiorino does not argue on appeal that the Panel could not make that finding. The record before the panel included six declarations by cooperating witnesses identifying Bellomo and Coppola as members of the Genovese crime family. As previously noted, the Panel was entitled to consider those declarations, and they constitute substantial evidence on the point. In addition, and also as previously noted, the District Council itself proclaimed that Frederick Devine removed Coppola as general steward at the Javits Center on August 6, 1991 because the Council concluded that he was a member of organized crime and knowingly associated with Bellomo, another member of organized crime. Accordingly, the status of both Bellomo and Coppola as "barred persons" under the Consent Decree is not at issue.

■ Nor does Fiorino press with any vigor a contention that substantial evidence does not support the Panel's conclusion that Fiorino knew of Bellomo's and Coppola's criminal connections. It would be difficult for Fiorino to do so, given District Council President Devine's proclamation on August 6, 1991. There was evidence in the record to show that after Coppola left the Javits Center, his duties as chief steward were divided between Fiorino and one Leonard Simon. Fiorino was Bellomo's brother-in-law. Fiorino and Coppola have been friends for many years. Fiorino was Coppola's best man at his wedding in May 1991. The Panel was thus entitled to reject Fiorino's testimony that he did not know what either Bellomo or Coppola did for a living.

■ The remaining issue is whether the record contains substantial evidence supporting the Panel's conclusion that Fiorino knowingly "associated" with Bellomo and Coppola.

A threshold question arises with respect to Fiorino's association with Bellomo. Bellomo was one of the individual defendants in the government's civil RICO action against the District Council. On March 23, 1993, Bellomo and the government entered into a consent judgment. ¶¶ 2 and 3 of that consent judgment provided as follows:

2. Defendant Bellomo is hereby prohibited from knowingly participating in or having any future dealings of any nature whatsoever, directly or indirectly, with any officer, agent, representative or employee of the District Council of New York City and Vicinity of the United Brotherhood of Carpenters and Joiners of America ("District Council"), or any affiliated benefit fund or pension plan, regarding any matter which relates directly or indirectly to the affairs of the District Council or any affiliated benefit fund or pension plan.

3. Nothing in this Consent Judgment shall prohibit Bellomo from communicating with any person related to him by blood or marriage, including Anthony Fiorino, regarding any matter except those which relate directly or indirectly to the affairs of the District Council or any affiliated benefit fund or pension plan.

Fiorino argues that since the Bellomo consent judgment, endorsed by this Court, specifically permitted Bellomo to associate with Fiorino, it is preposterous to read the Court's Consent Decree as prohibiting Fiorino from associating with Bellomo. After all, if, as in the vernacular, it takes two to tango, it takes two to associate. How can A be permitted to associate with B, but B be prohibited from associating with A?

This contention has force, somewhat more than indicated by the IRO's dismissive response in his brief. Nevertheless, I do not think Fiorino's contention withstands analysis.

If these two consent orders had been entered at the same time, Fiorino's argument would be stronger. The government cannot be allowed to speak simultaneously in an inconsistent, forked-tongue fashion. But the timing of these orders is different, and, more significantly, so are the circumstances existing at the time of their execution.

When the government entered into the consent judgment with Bellomo, its civil RICO action against the District Council and various individuals was being litigated energetically. The District Council denied the government's allegations of corruption by the Genovese crime family and the consequent failure of the District Council officers to discharge their fiduciary duties. Magistrate Judge Katz was supervising contentious pretrial discovery. During this period, a number of individual defendants entered into separate settlements with the government, taking the form of consent judgments. Bellomo was one of those individuals.

The main case was then called for trial. Some weeks into the trial, the parties entered into the Consent Decree. It was filed on March 4, 1994, almost a year after the Bellomo consent judgment was filed.

While the District Council and its officers neither admitted nor denied the allegations in the government's complaint, the Consent Decree for the first time enjoined members of the District Council and its constituent locals, including Fiorino, from, *inter alia*, knowingly associating with members of organized crime. The March 23, 1993 order, on the other hand, was concerned solely with Bellomo. The government was not then in a position to ask, and the Court was not in a position to direct, that Fiorino (a union member) not associate with his brother-in-law Bellomo (not a union member). By the same token, Fiorino, who is not a party to the Bellomo consent judgment, is not in a position to argue that the Bellomo consent judgment conferred any rights or privileges upon him. In March 1994, circumstances changed materially, when Fiorino and other union members for the first time became subject to a Court order prohibiting them from knowingly associating with organized crime figures. That class of "barred figures" includes Bellomo; and neither the government nor the IRO are estopped by the Bellomo consent judgment from enforcing the provisions of the Consent Decree against Fiorino.

In sum, Bellomo's permission to associate with Fiorino, contained in the March 1993 consent judgment, has been overtaken by subsequent events, namely the provision in the 1994 Consent Decree prohibiting Fiorino from knowingly associating with organized crime figures, including Bellomo.[6]

Of course, this conclusion does not preclude Bellomo and Fiorino from any familial contact. *Ciccone*, summarizing the IBT litigation, points out that "truly incidental contacts with prohibited individuals, such as encounters at weddings and funerals, are permitted." 44 F.3d at 1096. I construe that language as applying to all individuals, not just those related by blood or marriage; and it follows that "truly incidental contacts" between individuals so related will probably be more frequent unless, as sometimes happens, the family members do not like each other. The decisive question is whether there is substantial evidence in the record of an association between Bellomo and Fiorino that transcends the "truly incidental contacts" inherent in a family relationship, and passes into the prohibited realm of a "calculated choice to associate with persons of a prohibited status." Stated another way, does the evidence permit an inference that the contacts between Bellomo and Fiorino went beyond the boundaries of contacts generated by the circumstance that Bellomo was married to Fiorino's sister?

The Panel had before it the declarations of six cooperating witnesses which established a relationship between Bellomo and Fiorino "going beyond family contacts between brothers-in-law." Panel Decision at 12. Specifically, one or another of these witnesses testified that Bellomo replaced Coppola with Fiorino; that Fiorino assumed Coppola's responsibilities on behalf of the Genovese crime family; and that Fiorino, in his supervisory role at the Javits Center, conveyed messages between Coppola and Bellomo. *Id.* at 12–13. The statements of these cooperating witnesses corroborate each other; and the references in those statements to the relationship between Bellomo and Fiorino, culled from declarations that range over many areas, are not suggestive of

---

**6.** Quite apart from these considerations, Bellomo's consent judgment did not sanction unlimited access to Fiorino. Bellomo could not communicate with Fiorino about union matters. ¶ 3.

a concerted effort by these witnesses to describe a relationship between Bellomo and Fiorino that did not exist.

Such factors support the Panel's conclusion that the declarations of the cooperating witnesses, although hearsay, had sufficient indicia of reliability to be credible.

But these declarations, while furnishing relevant background information, are for the most part not directly probative of Fiorino's association with Bellomo and Coppola after August 1, 1991, the beginning of the period alleged in Charge One. That is because the declarations of these cooperating witnesses deal, for the most part, with events occurring prior to that time. *See* Barth opinion at 4 n. 1.

However, the record contains significant additional evidence with respect to Fiorino's post-August 1991 association with Bellomo. The IRO offered telephone records showing calls made from Bellomo's residence. During the period from January 25, 1993 through November 9, 1994, 372 calls were made from Bellomo's home to Fiorino's beeper. That volume of telephone traffic could reasonably be regarded as evidence of purposeful communications between Fiorino and Bellomo that extend beyond incidental contacts between brothers-in-law.

Fiorino testified that all of these telephone calls to his beeper were from his sister, Bellomo's wife. The Panel disbelieved him. "We do not accept that as a credible explanation of the unusually large number of calls, especially in the absence of substantiating testimony from Fiorino's sister, whose availability and accessibility to [Fiorino] we have no reason to doubt." Panel Decision at 14.

Fiorino argues on appeal that the Panel's reference to his failure to call his sister to testify impermissibly shifted the burden of proof from the IRO to Fiorino. There is no substance to this argument. Fiorino chose to testify that the calls from Bellomo's home were initiated by his sister, thereby seeking to distance himself from Bellomo. The factfinders, without altering the burden of proof, could properly consider the sister's failure to appear to corroborate Fiorino's explanation. A criminal case, *United States v. Parker,* 903

F.2d 91 (2d Cir.), *cert. denied,* 498 U.S. 872, 111 S.Ct. 196, 112 L.Ed.2d 158 (1990), furnishes an instructive analogy. The case involved the armed holdup of a payroll truck. The government charged that Parker was the "inside man" who interrupted his own delivery route on the morning of the crime in order to telephone to a confederate the schedule of the targeted truck. A payroll employee riding in Parker's truck testified that Parker had said that the call was to his sister. The prosecutor argued in summation: "I ask you, ladies and gentlemen, since Eric Parker decided to call witnesses, why didn't he call his sister to say on the morning of the robbery he called me.... He didn't call his sister to the stand, ladies and gentlemen, because he didn't call his sister on the morning of May 13th." 903 F.2d at 98. The trial court allowed the argument over Parker's objection, while reminding the jury that the government bore the burden of proving guilt beyond a reasonable doubt and the defendant need not offer any evidence. The Second Circuit affirmed Parker's conviction, stating that the government was "entitled to comment on a defendant's failure to call witnesses to contradict the factual character of the government's case, as well as his failure to support his own factual theories with witnesses." *Id.* (citations and internal quotation marks omitted). The proposition in the case at bar is precisely the same. The Panel never lost sight of the IRO's burden of proof; it is referred to throughout the decision. But the Panel was entitled to consider, as bearing upon Fiorino's credibility, the fact that Fiorino did not call his sister to corroborate his account. And if that account is rejected, the telephone calls furnish evidence of repeated contacts between Fiorino and Bellomo, an organized crime figure.

Fiorino did acknowledge a meeting with Bellomo in early 1995. At that time, Fiorino was being deposed by the IRO. While driving home from work at the Javits Center, Fiorino encountered Bellomo walking on First Avenue in the 90's. Fiorino pulled over and the two men conversed for 10 or 15 minutes. Fiorino testified that this was a chance meeting, that they spoke only of Fiorino's sister, and that he said nothing to Bellomo about the deposition then in progress.

The Panel rejected that testimony as implausible.

I am not prepared to disturb the Panel's evaluation of Fiorino's credibility. The law of this circuit recognizes the "superior vantage point" of hearing officers like the members of the Panel, whose "credibility findings ... will not be overturned unless they are hopelessly incredible or they flatly contradict either the law of nature or undisputed documentary testimony." *Cimino,* 964 F.2d at 1313 (citations and internal quotation marks omitted). That cannot be said in the case at bar.

When I view this evidence of Fiorino's post-August 1991 contacts with Bellomo in the light of the origin and nature of their relationship, as evidenced by the declarations of the cooperating witnesses, I conclude that there is substantial evidence in the record to sustain the Panel's finding that Fiorino knowingly associated with Bellomo during the period embraced by Charge One.

 I reach the same conclusion with respect to Coppola, although it is a closer case. There is an abundance of evidence that Coppola was associated with the Genovese crime family, and that Fiorino knew it. But that is not sufficient to sustain a charge that Fiorino knowingly associated with Coppola in August 1991 and thereafter. There is evidence of contacts between the two men during that period. If they amount to nothing more than "truly incidental contacts," such as "encounters at weddings and funerals," *Ciccone,* 44 F.3d at 1096, the IRO has not sustained his burden. If the contacts demonstrate a "calculated choice" on Fiorino's part to associate with Coppola, the charge is proven. *Id.*

The evidence of Fiorino's contacts with Coppola come entirely from Fiorino's testimony, at his deposition and at the hearing. There are no independent sources of evidence such as telephone records.

The Panel majority devoted one sentence to these contacts, stating that "[Fiorino] met Coppola on the street a number of times, visited Coppola at his house in Eastchester, and spoke on the telephone with him." Decision at 15. That was sufficient, in the major-

ity's view, to establish a knowing association. Panel member Barth, concurring in the result, based his conclusion on Fiorino's visit to Coppola's home; in his view, Fiorino's testimony did not demonstrate any other "deliberate meeting" with Coppola. Barth Opinion at 2.

It is certainly true that some of the contacts Fiorino described in his testimony cannot be characterized as deliberate meetings. The IRO in his brief at 21–22 suggests that Fiorino conceded that he had "knowingly associated with Ralph Coppola after August 1991"; but the quotation is taken from the majority decision at 15. The IRO also cites to Fiorino's hearing testimony at Tr. 1385; but all Fiorino said there was that "I play ball in Morris Park and naturally there are times in the course of a summer day, he will drive by, I will be playing on the field, he will drive by, hello, whatever." Such ballfield passing encounters, which can only be described as "truly incidental contacts," were prone to occur because, Fiorino testified, "[Coppola] came from the same area, Morris Park—well, he came from Eastchester Road and I came from Morris Park." *Id.* An encounter at a neighborhood ballfield is, for all practical purposes, the same as an encounter at a wedding or funeral. They each involve gatherings of people for communal purposes, some joyful, some solemn, some recreational, rather than one-on-one meetings or conversations. In such circumstances, individual contacts are incidental to the social function.

However, as all three Panel members recognized, that cannot be said of Fiorino's decision to visit Coppola at Coppola's home in Eastchester. Fiorino testified in his deposition on October 6, 1994 that he paid that visit "maybe two years" earlier, placing the meeting in 1992, well after Coppola was removed from the Javits Center because of his organized crime connections. The reply brief for Fiorino at 15 minimizes the incident by saying Fiorino "passed by Coppola's residence after participating in a sporting event nearby." If that was an accurate description, I would not be concerned with it. But Fiorino did not pass by Coppola's residence. He stopped, entered the residence, and met with

Coppola. Fiorino denies discussing union business with Coppola, and there is no evidence to the contrary, but that is not a necessary element to this Charge.

Fiorino also expressed his belief, at his deposition, that he had spoken on the telephone with Coppola since the latter's removal in August 1991, Dep. Tr. 164, and acknowledged the possibility of speaking with Coppola as recently as 1994. Hearing Tr. 1512.

While it is possible to draw two inconsistent conclusions from this evidence, that does not preclude a holding on review that substantial evidence supports the Panel's finding that Fiorino knowingly associated with Coppola. I hold that substantial evidence on the point exists in the record.

■■■ To the extent that Fiorino's contacts with Bellomo and Coppola antedate the execution of the Consent Decree in March 1994, they cannot be said to violate ¶ 2(b) of the Decree. But a union member's knowing association with members of organized crime may be regarded as conduct "discreditable" to the union, and thus violative of the District Council By–Laws and the Local's Constitution. I can discern no practical difference between that prohibition and the provision in the IBT Constitution that union members not bring "reproach" upon the union. The Second Circuit held in *DiGirlamo*, 19 F.3d at 823, that a union member's association with known members of organized crime violated that provision.

It remains only to say that if the proof of Fiorino's knowing association with Coppola should be regarded as insufficient, there is clearly substantial evidence of his knowing association with Bellomo; and, particularly considering Bellomo's prominence in the Genovese crime family, as described by the cooperating witnesses, that association is sufficient in itself to sustain Charge One against Fiorino.

*Charge Two:*

Charge Two of the IRO's presentment against Fiorino reads as follows:

7. The charge refers to "other exhibition venues," but they are not named, and at the hearing the

You violated 29 U.S.C. § 158(b)(1)(A) (the National Labor Relations Act), your Obligation, Section 20(B) of the District Council By–Laws and Addendum, and Article V, Section 1 of the Constitution and By–Laws of Local Union 257, by engaging in improper conduct, committing an offense discreditable to the Union, and breaching your duty of fair representation to Union members,

TO WIT, beginning in or around April 1994, and continuing thereafter, while a member of Local Union 257 serving as the representative of the District Council at the Javits Center, you knowingly discriminated against members of constituent local unions desiring work at the Javits Center and other exhibition venues by referring for work before any others a small pool of favored individuals.

The IRO did not allege in Charge Two a violation by Fiorino of the Consent Decree. Instead, the charge is laid under section 8(b)(1)(A) of the National Labor Relations Act, 29 U.S.C. § 158(b)(1)(A), as well as under the previously cited provisions of the District Council By–Laws and the Local 257 Constitution.

■■■ Section 8(b)(1)(A) underlies the IRO's allegation in Charge Two that by engaging in discriminatory hiring practices at the Javits Center,[7] Fiorino breached his duty of fair representation to union members. That section declares it to be "an unfair labor practice for a labor organization or its agents: (1) to restrain or coerce (A) employees in the exercise of the rights" guaranteed by the statute. The section has been construed to bar the use in job referrals of "unfair, irrelevant, or invidious considerations." *Breininger v. Sheet Metal Workers International*, 493 U.S. 67, 85 n. 9, 110 S.Ct. 424, 436 n. 9, 107 L.Ed.2d 388 (1989). The duty of fair representation requires a union and its agents to "represent fairly the interests of all bargaining-unit members during the negotiation, administration and enforcement of collective-bargaining agreements," *International Brotherhood of Electrical Workers v. Foust*, 442 U.S. 42, 47, 99 S.Ct.

IRO offered proof only with respect to the Javits Center.

2121, 2125, 60 L.Ed.2d 698 (1979), a broad concept that extends to the fair implementation of collective bargaining agreements, *NLRB v. Local 282, IBT,* 740 F.2d 141, 146 (2d Cir.1984). These principles are implicated in the case at bar because the manner in which carpenters were referred to work at various job sites, including the Javits Center, was provided for in the collective bargaining agreement between the District Council on behalf of its constituent local unions and the construction industry.

Fiorino seeks to avoid the thrust of these cases, upon which the IRO relies, by arguing that they involve actions against unions, not individuals. This argument is frivolous. Unions, like all organizations, can only act through individual officers or agents. Recognizing that reality, 29 U.S.C. § 158(b)(1)(A) proscribes unfair labor practices by "a labor organization or its agents." It is undisputed that from April 1994, the beginning of the time period specified in Charge Two, Fiorino was the District Council representative at the Javits Center.

A Panel majority, Messrs. Kaufman and Curran, concluded that the IRO had proved his charge that from April 1994 and thereafter, Fiorino "knowingly discriminated against members of constituent local unions desiring work at the Javits Center ... by referring for work before any others a small pool of favored individuals." There is no question that such conduct on Fiorino's part, if proved, would violate § 8(b)(1)(A). The third Panel member, Mr. Barth, dissented on the point, concluding that the charge was not proved. The issue on appeal is whether the majority's conclusion is supported by substantial evidence.

The majority fashioned a three-link chain of reasoning to arrive at its conclusion. First, the majority found a traditional practice of favoring Genovese family "regulars" for employment at the Javits Center. For this proposition the majority relied upon the declarations of certain of the cooperating witnesses. Second, the majority found a contemporaneous manifestation of that practice in "pool lists" dated April, May and June, 1994, maintained at the District Council, which contained the names of 94 carpenters

frequently employed at the Javits Center, a number of whom were identified by law enforcement agencies as associates of the Genovese crime family; related to Genovese family associates; or convicted of various crimes. The majority considered certain statistics derived from these lists. Third, the Panel looked to the supervisory authority devolving upon Fiorino when he became the District Council representative at the Javits Center in April 1994. On the basis of the first two sources of evidence, the majority concluded that "it establishes by a preponderance of the evidence that the pool list members did receive improper preferential treatment." Decision at 19. The majority then concluded: "Because Fiorino, since at least becoming District Council representative, had supervisory authority over the job-referral system, we find that Charge Two is proved." *Id.*

That conclusion has a resonance of *respondeat superior,* although the majority did not use the phrase. It is necessary at this point to consider the evidence in greater detail, with particular reference to the part Fiorino played in hiring practices at the Javits Center.

Many of the undisputed pertinent facts are stated in the Panel decision. Fiorino became a member of Local 257 of the Carpenters Union in 1982, at the age of 21. From 1982 until May 1988, Fiorino worked as a carpenter on outside construction jobs. The Javits Center opened in 1986. Fiorino began working at the Center in or about May 1988. Panel Decision at 4–5.

With respect to the assignment of carpenters to work at the Javits Center, no one local had primary jurisdiction. The District Council had the authority to assign carpenters to the Center, drawing upon the membership of its constituent locals. In practice, the District Council delegated that authority to a union official designated the District Council representative for the Center, or to that individual's assistant, known variously as the chief steward, general steward, or shop steward. *Id.*

When Fiorino began work at the Javits Center in May 1988, Frank Perez was the

District Council representative and Ralph Coppola the chief steward. Shortly after his arrival, Fiorino was appointed timekeeper, a post subordinate to that of chief steward.

As noted, in August 1991 Devine removed Coppola as chief steward at the Javits Center for the stated reasons that he was a member of organized crime or knowingly associated with a member, namely Bellomo. Decision at 5.

The majority decision says at 5–6:

Upon Coppola's removal from the Javits Center, there was no official replacement of him as chief steward. Rather, the duties were divided between Fiorino and Lenard Simon. Simon was Coppola's brother-in-law. Fiorino was primarily on the floor, attending to such duties as dealing with jurisdictional disputes and resolving issues between contractors or exhibitors and workers. Simon was ordinarily in the office and he primarily took care of making the calls for the required number of workers needed. When Simon was unavailable to do this, Fiorino did it. The arrangement was officially recognized in early 1994 when Fiorino and Simon were designated by Frederick Devine as District Council representatives at the Javits Center.

Lenard Simon resigned from the union and Fiorino became the sole District Council representative at the Javits Center in April 1994, the beginning of the time period embraced by Charge Two. Fiorino also was appointed a negotiator for the District Council with respect to a new collective bargaining agreement, which was signed in September, 1994. The new agreement preserves the provision of the former one entitling an employer to hire 50% of its work force on a project from any source, union or non-union. With respect to the balance of carpenters designated by the District Council, the agreement provides that referrals are to be made first from the most highly qualified "A" category. At the hearing, the parties took different views of the new agreement. Fiorino urged that the agreement "greatly expands the opportunities for Carpenters to get Javits Center work assignments," Panel Decision at 18, and thus professed himself to be

an enlightened reformer in negotiating it. The IRO criticized the agreement as preserving the prior corrupt system by effectively securing referrals for the 94 pool list individuals who had received them in the past and garnered sufficient experience to warrant placement in the privileged "A" category. The Panel found it unnecessary to reach the issue. The parties reiterate their positions in the briefs on appeal.

■■■ On this as on any charge, "we do not reweigh the evidence presented at the disciplinary hearing; instead, we look only to see whether adequate evidence was presented to support the [Panel's] decision." *Cimino*, 964 F.2d at 1313. Applying this standard of review, I affirm the Panel's decision on Charge Two.

Contrary to Fiorino's contention, the declarations of the cooperating witnesses discussed at pages 6–9 of the Panel Decision are adequate to show that over time, some carpenters "receive[d] preferential treatment because of connections to the Genovese Crime Family." Decision at 18. However, as the Panel implicitly recognized, this evidence alone was not sufficient, since the cooperating witnesses' personal knowledge did not extend beyond the mid–1980's, before Fiorino was anointed District Council representative and vested with responsibility for job referrals at the Javits Center. Charge Two, of course, is against Fiorino *personally*. He is charged with having engaged in discriminatory job referral practices *himself*. The question then, was whether the discriminatory referral practices described by the cooperating witnesses were knowingly maintained by Fiorino during his tenure as District Council representative, when he had supervisory responsibility over the job referral system at the Javits Center.

The Panel found that they were, and there is substantial evidence on the record to support that conclusion. During Fiorino's first three months as District Council representative—April, May and June of 1994—a pool list of 94 "favored" carpenters remained in effect. That "list dated back to the mid– and late–80's, albeit with members varying over time." Panel Decision at 8. During the

period January 1994 through March 1995, the 94 individuals on the pool list "accounted for 20.61% of the total hours worked by Carpenters at the Javits Center," despite representing only 3.7% of the total workforce of 2700 carpenters. *Id.* at 17. This was especially significant to the Panel in light of the fact that of those 94 statistically preferred carpenters, "12 are considered by law enforcement to be associates of the Genovese Crime Family and another 17 are related to individuals considered to be members or associates of the Genovese Crime Family." *Id.* at 9.[8]

The Panel majority said that it did not find these statistics "dispositive," *id.*, a disclaimer stressed by Fiorino and the District Council in their briefs. But the Panel did not dismiss the statistics as without probative value; it viewed them in connection with the declarations of the cooperating witnesses, and found that Fiorino had knowingly maintained the preferential referral system that existed prior to his becoming District Council representative. The linchpin of the Panel's conclusion was that Fiorino should have discarded the pool lists and instituted reforms as soon as he succeeded to Simon's responsibilities in April 1994. I decline appellants invitation to reweigh the evidence and disturb this finding. Having credited the testimony of the cooperating witnesses, the Panel acted reasonably in inferring that Fiorino was a willing heir to a corrupt throne from the fact that the pool lists remained intact and the statistical disparities remained significant during his tenure as District Council representative. This is so whether or not the new collective bargaining agreement negotiated by Fiorino entrenched the old system of preferential referrals, a question on which I reserve judgment.[9] That agreement was not executed until September 1994. At the very least, then, substantial evidence supports the Panel's conclusion that Fiorino maintained the corrupt system described by the cooperating witnesses between April and September of 1994. It is also worth noting that whatever the intentions behind the new agreement, its effect, as of March 1995, had not been to reduce the number of work assignments distributed to the 94 pool list individuals.

For these reasons, the Panel's decision upholding Charge Two is affirmed.

The Panel found that Charges Three and Four had not been proven. The IRO does not appeal from these rulings. I thus turn to an analysis of the remaining four charges, all of which the Panel upheld in rulings appealed from by Fiorino and/or the District Council.

*Charge Five:*

Charge Five reads:

You violated 29 U.S.C. § 186(b)(1) (the Taft–Hartley Act), your Obligation, Section 20(B) of the District Council By–Laws and Addendum, and Article V, Section 1 of the Constitution and By–Laws of Local Union 257, by engaging in improper conduct, committing an offense discreditable to the Union, and requesting or demanding a thing of value from a contractor,

TO WIT, in or around October 1985, while a member of Local Union 257, you requested or demanded, and received, on behalf of yourself and Attilio Bitondo, a business representative of Local Union 257, window blinds from a contractor at a job site at which you were a job steward.

The crux of the charge is that Fiorino abused his influence at the Javits Center by coercing a contractor into giving him window blinds worth approximately $300 for free. At the hearing, the IRO conceded that he could not

---

8. The Panel majority also stated that 27 carpenters "have criminal convictions (13 overlap with the previous 29), though a number of the convictions appear to be for misdemeanors and violations." Decision at 9–10. In my analysis of the adequacy of the evidence on Charge Two, I give no weight to convictions of carpenters who are not identified by law enforcement agents as members or associates of the Genovese Crime Family or their relatives. The IRO's theory in Charge Two is that Fiorino preferred carpenters on the pool lists because of their organized crime connections. An individual may have a conviction on his record and not be a member of organized crime. Nor can the pool lists themselves be regarded as an organized crime job list, as Mr. Barth correctly observed in his concurrence and dissent at 6.

9. The validity of the new collective bargaining agreement is currently *sub judice* in a separate motion before this Court.

prove a Taft–Hartley Act violation arising from this conduct because it was not clear whether the contractor employed District Council union members. The Charge thus went to the Hearing Panel on the theory that Fiorino had committed an offense "discreditable" to the Union under the Constitution and By–Laws of the District Council and Local 257. The only dispute on this score was whether Fiorino had pressured the contractor to give him the blinds for free.

At the hearing, Fiorino testified that

the installer was working for a tenant in the building, and [he] told the installer he would be interested in purchasing any blinds which could be spared. The installer told Fiorino that he could spare $300 worth. Fiorino took the blinds and gave them to Bitondo, who, according to Fiorino, then sent the installer $300. Bitondo gave Fiorino one of the blinds.

Panel Decision at 27. The Panel did not credit this testimony because it conflicted with prior testimony Fiorino had given on the subject before a New York State grand jury while under a grant of transactional immunity. When asked before the grand jury whether he paid for the blinds, Fiorino responded, "No, I told you, I asked him if he had extra." Id. "Since the grand jury testimony was closer in time to the event, and since [Fiorino] had greater incentive to testify truthfully there because he was immunized for everything except perjury," Panel Decision at 28, the Panel credited Fiorino's first story and rejected his second.

The Panel went on to conclude that Fiorino had pressured the installer to give him the blinds. Although there was no direct evidence on the point, the Panel felt that Fiorino's false testimony at the hearing was indicative of conscious wrongdoing and that the "overall tenor" of a taped conversation between Fiorino and Bitondo concerning the blinds was too suspicious and secretive for them to have been discussing legitimate dealings. Panel Decision at 29. Finally, the Panel noted Fiorino's testimony that he understood it would be illegal to receive the

blinds for free. The Panel thus found that Charge Five was proved.

■ Counsel for Fiorino makes a rather half-hearted attempt to challenge these findings.[10] He first notes that neither Bitondo nor Fiorino was charged with a crime in connection with the blinds after they testified about them before the State grand jury. Of course, that may well be because they were granted transactional immunity in return for offering the testimony. But even if the immunity did not extend so far, the fact that Fiorino was not charged with a crime does not mean he did not commit the offense. The Panel could clearly conclude that he extorted the blinds, even though the state decided not to prosecute him for this relatively minor offense.

■ Fiorino next contends that there was no evidence in the record to establish that the individual who gave Fiorino the blinds was a contractor who employed union members, or that he was working at the same job site as Fiorino. That may be true, but there is a simple explanation for this purported dearth of evidence. As the Panel noted:

[T]here is no dispute that [in the taped conversation, Fiorino and Bitondo] are discussing $300 worth of window blinds which Fiorino obtained for himself and Bitondo from a contractor who was installing blinds in a building in which Fiorino was working in 1985. *The parties agree that the only dispute is whether the contractor was pressured by Fiorino to provide blinds for free, or whether the contractor provided the blinds as part of a transaction for which he was paid.*

Panel Decision at 26–7 (emphasis added). At the hearing, then, only two issues were disputed, the issues of payment and pressure. It is therefore entirely reasonable that the evidence would address only these subjects and not others—the IRO could not be expected or required to proffer evidence in support of stipulated facts. Fiorino will not now be heard to argue that the evidence on certain elements of the charge was lacking

10. The District Council does not join Fiorino in his attempt to overturn the Panel's decision on Charge Five.

when he conceded the existence of these elements at the hearing stage.[11]

■ Finally, Fiorino feebly argues that "the IRO did not and could not contradict Fiorino's testimony that these window blinds were purchased and paid for by Atilio [sic] Bitondo." Fiorino Brief at 17. But the Panel's decision states clearly that Fiorino's own testimony before the State grand jury directly contradicted his hearing testimony. Under the circumstances, the Panel was entitled to credit the former, not the latter.

I thus conclude that the Panel's findings upholding Charge Five were supported by substantial evidence on the record.

*Charge Six:*

In Charge Six, the IRO levied the following accusation against Fiorino:

> You violated Section 20(B) of the District Council By–Laws and Addendum by engaging in improper conduct,
>
> TO WIT, beginning in or around May 1988, while a member of Local Union 257 serving as shop steward at the Javits Center, and continuing after April 1994, while serving as the representative of the District Council at the Javits Center, you aided and abetted violations of Section 16E of the District Council By–Laws and Addendum and were derelict in performing your duties, in that you allowed individuals to work at the Javits Center while they were not members in good standing of the Union.

The Panel concluded that Charge Six was proved. Noting that under Section 16E of the By-laws, "[a]ll Union members are required to carry the work card of the current quarter and are subject to removal from the job for failure to carry it," Panel Decision at 30, the Panel unanimously found that as timekeeper at the Javits Center, Fiorino had a responsibility to enforce this provision by checking the carpenters' work cards as they arrived for work each morning. The Panel further found that once Fiorino was promoted to District Council representative at the Javits Center in April 1994, he possessed supervisory responsibility over the timekeeper to ensure that cards were checked. There was no dispute that Fiorino had neglected to perform these tasks. Nor was there a dispute that several individuals who were not in good standing with the Union had worked at the Javits Center during Fiorino's tenure as timekeeper and District Council representative. In the Panel's view, "permitting this to occur and persist was a dereliction of Fiorino's duties as shop steward/timekeeper and District Council representative." [12] Decision at 31.

■ In reviewing whether the Panel's decision is supported by substantial evidence, I turn first to the question of whether Fiorino violated the terms of Charge Six in his capacity as shop steward/timekeeper. I then consider the proof as it relates to Fiorino's conduct as District Council representative.

The IRO, counsel for Fiorino and the District Council expend much effort debating whether the Panel's finding that Fiorino had an affirmative duty as timekeeper to check work cards is supported by substantial evidence on the record. I think it is. All parties agree that this duty falls upon a shop steward on outside construction jobs. Relying in part on testimony of John Hamilton, an official of an exposition company which employs union members at the Javits center, the Panel determined that the obligations of a timekeeper at the Javits Center are the same as those of a shop steward on outside construction. Hamilton testified:

> Q: What are the responsibilities of a shop steward?

---

11. Fiorino also does not explain why the union status of the contractors' employees is material to the resolution of Charge Five. As best I can tell, whether or not the contractor employed union members would only be relevant for the purposes of establishing a Taft–Hartley Act violation. As noted, the IRO abandoned that portion of the Charge at the hearing stage. Thus, the issue was irrelevant, and properly left unresolved by the Panel.

12. Mr. Barth concurred in the judgment that Charge Six was proved, but felt that the penalty of expulsion imposed by the majority was inappropriate because Fiorino "was not the shop steward when most of the violations occurred. He did not sign the reports after he was a District Council representative. Nonetheless, he should have supervised the shop stewards." Barth Opinion at 8.

A: In the morning, he checks the men in to make sure they hold valid union cards and then in the course of a day he's a working shop steward. Then, in the course of the day, if exhibitors are present, he'll make sure that nobody is doing the work of his jurisdiction.

* * * * * *

Q: Did there come a time when the shop stewards at the Javits Center were called something else?

A: Timekeepers.

Q: And approximately how long ago did that shift happen when shop stewards started to be called timekeepers?

A: Probably two years.

* * * * * *

Q: But to the best of your knowledge, are the duties of a shop steward and a timekeeper the same?

A: Yes.

Tr. at 1249–50. Support for Hamilton's account can be found in the fact that as timekeeper, Fiorino filled out "shop steward reports" listing who worked and when, and that individual's local affiliation. Presumably, the local affiliation of a particular member and the member's good standing within that local could only be properly verified by checking his work card.

Despite that corroboration, the District Council challenges the accuracy of Hamilton's testimony, claiming that he lacks personal knowledge of a timekeeper's duties. It is true, as the District Council asserts, that Hamilton has never been a shop steward or timekeeper, nor has he supervised one. But Hamilton, a union member himself, worked for several years at the Javits center, and thereafter employed union members for his exposition service. Presumably, these experiences provided Hamilton with ample opportunity to observe the Javits Center timekeeper at work. The Panel was therefore justified in relying on his testimony that a timekeeper is essentially a shop steward with a different name.

The Panel did not rely on Hamilton's testimony alone, however; it also relied on common sense. The Panel observed: "Fiorino's assertion is hard to accept because the inevitable result is that, if true, there is no check on workers' membership status. It could permit non-members to work indefinitely." Panel Decision at 31. The District Council claims that in point of fact, a separate check on the membership status of Javits Center carpenters existed: screening by the referring local union. In its reply brief at 32, the District Council insists that "local union business agents referring members from local union halls were required to check the worker's dues standing (and work card) before sending the worker to the job." There is however nothing in the record to support this view. Indeed, if anything, the transcript pages cited by the District Council belie it. For example, Jim Davis, the District Council's Director of Organizing, testified:

Q: So it's really the job of the business agent or the union official at the local who refers the individual out to the job to make sure that he is paid up before he gets to the job?

A: I hesitate because I say yes, but under the job referral rules that are into effect here, somebody who comes to the top of that list in a referral hall, and we had some in the city prior to the Judge Conboy, that is now if somebody comes to the top of the list, whether they are union or not, you have to send them.

Q: You have to refer them?

A: You have to.

Tr. at 1039–40. This excerpt, curiously cited by the District Council in support of its contention, indicates that local business agents had little, if any, discretion in referring carpenters for work at the Javits Center: they were required to refer those at the top of the referral list, regardless of the individual carpenter's standing in the union. This provides support for the Panel's finding, discussed above, that the District Council, and by delegation its representative, had *de facto* control over referrals at the Javits Center. Moreover, it undermines the District Council's contention that constituent locals were responsible for, and in fact did, check

workers' cards before sending them to the Javits Center.

I therefore conclude that there is substantial evidence on the record to support the Panel's finding that Fiorino, as Javits Center timekeeper, had the same duties as a shop steward to check each carpenter's work card prior to assigning him work.

■ This, however, does not end the analysis. Contrary to the view of the IRO, Fiorino is not charged with failing to fulfill his duty to check work cards. Rather, Charge Six alleges that Fiorino was derelict in "allow[ing] individuals to work at the Javits Center while they were not in good standing of the Union." At first glance, the difference may seem purely semantic. This was apparently the view of the Panel. As best I can tell from its decision, the Panel saw Fiorino's refusal to check cards as a deliberate omission which effectively allowed members to work who were not in good standing with the union. However, failing to check cards and accurately report each union member's status is one thing; improperly allowing members who are not in good standing to work is quite another. Unlike the former, the latter implies that Fiorino was vested with legal authority to require an employer to fire or refuse to employ a delinquent carpenter, that he had the practical ability to exercise that authority on behalf of the union, and that he failed to exercise it in the appropriate circumstances. Looked at another way, Fiorino cannot be implicated for "allowing" something to occur if he had no power to prevent it. That is so, even if Fiorino neglected his duty to check cards and

keep accurate records. The one does not follow necessarily from the other.

The Panel did not reach this level of analysis, stopping short at its finding that Fiorino had breached his duty to check cards. It did not determine whether the precise wording of Charge Six had been proven, that is, whether Fiorino had allowed something to occur which he had the duty and ability to prevent. As I discuss below, the record evidence on this point convinces me to reverse the decision of the Panel insofar as it applies to Fiorino's conduct as timekeeper.

■ A union member may not be in good standing and be suspended or expelled from union membership for any number of reasons, including failing to pay dues, causing dissension among members of the union, defrauding the brotherhood, and crossing a duly authorized picket line.[13] As a general matter, federal labor law prohibits a union from causing an employer to discriminate against an employee in order to induce the employee to join the union or behave like a "good" union member. *See WPIX, Inc. v. N.L.R.B.*, 870 F.2d 858, 865 (2d Cir.1989) (citing *Radio Officers' Union v. N.L.R.B.*, 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455 (1954) and *N.L.R.B. v. Milk Drivers and Dairy Employees Local 338*, 531 F.2d 1162 (2d Cir. 1976)). Moreover, an individual who has been denied or terminated from membership cannot be the subject of union-induced discrimination by the employer, unless his poor standing in the union derives from a failure to pay dues. *See generally N.L.R.B. v. Local U. No. 74, Int. Ass'n of Marble, Slate, etc.*, 471 F.2d 43, 46–47 (7th Cir.1973). These

13. Section 51 of the Constitution of the United Brotherhood of Carpenters and Joiners of America delineates a complete list of offenses which can lead to suspension or expulsion: (1) causing dissension among the members of the United Brotherhood; (2) advocating division of the funds of the United Brotherhood or any subordinate body thereof; (3) advocating separation of any subordinate body from the United Brotherhood; (4) misappropriating the funds of any subordinate body, or any moneys entrusted to him or her by a member or candidate for the account of any subordinate body; (5) improper harassment of any member of the United Brotherhood; (6) defrauding the United Brotherhood or any subordinate body; (7) furnishing to any unauthorized person, without the consent of the Local Union, a list of the membership; (8) divulging to any unauthorized person, the business of any subordinate body without its consent; (9) divulging the quarterly Password for any purpose other than to enter the meeting; (10) crossing or working behind a picket line duly authorized by any subordinate body of the United Brotherhood; (11) failure to deposit Transfer Card before going to work in a locality where a strike or lockout is pending or in effect; (12) lumping for any owner, builder, contractor, manufacturer or employer; (13) violating the Obligation; (14) soliciting or accepting contributions, by a candidate for any elective office or position, from other than members of the United Brotherhood. IRO Exhibit 42 at 71–72.

precepts are codified in section 8(b)(2) of the NLRA, 29 U.S.C. § 158(b)(2), which provides that a labor organization commits an unfair labor practice if it:

> cause[s] or attempt[s] to cause an employer to discriminate against an employee in violation of subsection (a)(3) of this section [14] or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership.

Thus, as Donald Sapir, the District Council's outside counsel, noted in uncontradicted testimony before the Panel, anyone, union or non-union, may sign up for a referral to the Javits Center with the local referral hall, and the local would be compelled, under federal labor law, to refer that person for work on an equal basis with others on the referral list, regardless of whether he was a member or not. Tr. at 809–10. Sapir went on to explain that under a union security clause in the collective bargaining agreement, the union may insist that nonmembers who have worked at the Javits Center for more than seven consecutive days join the union and pay dues. If the employee refuses for other than religious reasons, the union may, under the agreement, refuse a referral or compel the employer to fire the employee. Union security agreements of this sort are permissible under the terms of section 8(a)(3) of the NLRA, 29 U.S.C. § 158(a)(3). *See N.L.R.B. v. Actors' Equity Ass'n*, 644 F.2d 939, 941 (2d Cir.1981).

What all this meant for Fiorino was that if an employee appeared at the Javits center for work and was unable to produce a work card indicating that he was in good standing with the union, Fiorino or the District Council representative could refuse a referral in an attempt to encourage membership only if: (1) the employee had been denied or terminated from membership because of a failure to pay dues; or (2) he had worked at the Javits Center for more than seven days and refused to pay dues after being asked to do so.[15] Fiorino would not be able to determine whether either scenario was in fact the case simply from the employee's inability to produce a work card; he would have to call the union and inquire into the reason why the employee did not have one. Only then could he or the District Council representative properly deny work to delinquent employees in accordance with federal labor law and the collective bargaining agreement.

Based on this, the District Council argues that Fiorino had no legal or practical ability to prevent workers who were not in good standing from working at the Javits Center, and thus cannot be held to have been in dereliction of his duties by allowing them to do so. As a legal matter, the District Council notes the circumscribed ability of the union, and Fiorino or the District Council representative as union agents, to force employers to deny employees work based on their union status. Further, the District Council contends that Fiorino had no practical ability to exclude those individuals who fell in either of the two categories above because the process of uncovering the true reason for their poor standing would be unduly time consuming and interfere with the timekeeper's assigning duties. In the District Council's view, Fiorino could not possibly be required to check on the status of each employee without a card as hundreds of other carpenters and their prospective contractors waited for the day's assignments to be made.

The argument has intuitive appeal, and was dismissed too quickly by the Panel, per-

---

**14.** NLRA section 8(a)(3) prohibits employers from discriminating against employees "in regard to hire or tenure of employment ... to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3).

**15.** The District Council By–Laws seem to support this view. The Panel wrote that under the By–Laws, members "are subject to removal from the job for failure to carry their work card." Actually, Section 16E of the By–Laws reads as follows:

> Members who fail to comply with this section shall be subject to removal from the shop or job under the terms of the collective bargaining agreement there applicable.

Thus, the By–Laws must be read in conjunction with the Javits Center collective bargaining agreement, and of course, federal labor law.

haps because the Panel focused exclusively on the time it would have taken Fiorino to simply check work cards. Of course, that routine task would only marginally increase the time it took Fiorino to sign each worker in. However, to actually prevent the employee from working, Fiorino would have to call the union and wait as local officials checked on the employee's precise status as a dues paying member. It is this follow-up responsibility that would consume too much time in light of the exigencies at the Javits Center, and which, practically speaking, divested Fiorino of any practical ability to prevent employees without cards from working there on the day they appeared.

Uncontradicted testimony in the record supports this conclusion. Jim Davis, the District Council's director of organizing, testified to the length of time it would take to check a worker's records, and how such a responsibility, were it placed upon the timekeeper, would be detrimental to the trade and industry. Tr. at 1068–69. Fiorino testified along similar lines, and went on to describe how shop stewards on outside construction jobs are not expected to prevent individuals without work cards from working. Tr. 1614–15. As Fiorino described it, in the context of outside construction, it was the responsibility of the local business agent or the District Council to review the shop steward reports and check the precise membership status of the employee, and then withhold further referrals from that employee if there was a valid legal basis for doing so. Tr. at 1614–15, 1631–32.

Fiorino thus had no practical ability to prevent carpenters in poor standing with the union from working on the day they appeared for work at the Javits Center. Nevertheless, the process of shop steward reporting and referring agent review, described by Fiorino as applying to both outside construction jobs and referrals at the Javits center, reveals how Fiorino may be seen as having improperly "allowed" individuals to work simply by neglecting his duty to check work cards. Presumably,

Fiorino could not fill out accurate reports without checking workers' cards; Fiorino would be forced to rely on the sometimes unreliable word of the worker himself as to which local he belonged to and whether he was in good standing with that local. Fiorino acknowledged as much in his testimony before the panel. Tr. at 1621, 1625. If in fact a particular report failed to alert the District Council representative [16] at the Javits Center that a particular worker was not in good standing, the employee could go on receiving referrals at the Javits Center indefinitely, even if his poor standing arose out of a failure to pay dues. The District Council representative would simply never check the employee's status in the union to find out whether that employee should receive referrals in the future. Thus, in this way, a timekeeper could "allow" employees who were delinquent in paying their dues to continue working at the Javits Center, despite his practical inability to turn those employees away on the day they appeared for the job.

The question thus remains whether this in fact happened: did Fiorino's failure to check cards as timekeeper result in workers continuing to receive referrals despite their failure to fulfill payment obligations owing to the union? The evidence in the record is ambiguous on this score, and if anything, indicates that it did not occur. IRO Exhibit 35a reveals that during Fiorino's tenure as timekeeper, Robert Defeo and Louis Russo worked at the Javits Center after their memberships had been suspended. The exhibit, however, does not state whether they were suspended for refusing to pay dues. Thus, it is not at all clear that the District Council representative could have precluded these referrals even had he wanted to. Also during Fiorino's tenure as timekeeper, Vincent Biglin, Richard Prunesti, and Daniel Adamo all worked at the Javits Center despite never having been members of the union. But each worked for a period of less than seven days. Even assuming, then, that Fiorino neglected to check their cards and accurately report their nonmembership status, the un-

---

**16.** As noted *supra,* the Panel found that the District Council representative was in charge of referrals at the Javits Center. Thus, he would be

the one to review the shop steward report and evaluate whether future referrals were appropriate.

ion was precluded under the collective bargaining agreement from demanding that they be fired for failing to pay dues. Accordingly, substantial evidence does not support the Panel's implicit conclusion that Fiorino's refusal to check cards as timekeeper allowed individuals to work who were excludable by the union.

■ I reach a different conclusion with respect to the portion of Charge Six which censures Fiorino's conduct as District Council representative. After Fiorino's promotion to this position, two individuals, Salvatore Larca and Richard Prunesti,[17] were permitted to work at the Javits Center for several consecutive months despite not being union members. IRO Exhibit 35b. In addition, four individuals whose dues were in arrears—Andrew Avitable, Vincent Bernardone, Glenn Dewitt, and Louis Russo—were allowed to work there as well. Id. As a legal matter, Fiorino, the District Council representative in charge of referrals at the Javits Center, could have precluded all six of these employees from working there. Of course, to do so, he would first have had to be alerted to the fact of each employee's poor standing, so that he could inquire into the reason for it and confirm that they were in fact excludable. As noted, that is the purpose of the shop steward report, the accuracy of which depends on a proper card check by the timekeeper. There is no debate that during Fiorino's tenure as District Council representative, work cards went unchecked, just as they did when he was timekeeper. The consequence, it appears, was that Fiorino allowed employees to work for months whom he should have, and could have, excluded in his capacity as District Council representative.

The Panel found that Fiorino should be held responsible for the continued employment of these individuals because as District Council representative, he had "supervisory responsibility to ensure that the shop stew-

ard check for union cards." Panel Decision at 31. Since cards were not checked and employees who had not paid their dues were improperly permitted to work as a consequence, Fiorino was held to have violated his duties as representative under the terms of Charge Six.

The District Council challenges this finding, claiming that the record lacks substantial evidence to support the Panel's view that Fiorino had supervisory responsibility over the card checking process. I do not agree. As noted above, the Panel found, and the District Council does not now dispute, that the union's designated representative at the Javits Center was vested with supervisory responsibility over the referral process. Decision at 19. It was the District Council representative who had authority to make the referrals. Decision at 4–5. From this, I think it was reasonable for the Panel to conclude that the representative had duty to ensure that referrals were properly made—that is, that the shop steward reports upon which the representative relied in making referrals were based upon diligent card checks. That there was not a timekeeper at the Javits Center at the time Fiorino was District Council representative does not divest him of this responsibility. Rather, it was incumbent upon him to check the cards himself if he had no subordinate officer to whom he could delegate that authority.

I thus uphold the Panel's decision on Charge Six insofar as it applies to Fiorino's conduct as District Council representative. However, I reverse the Panel's finding that Fiorino breached his duties as timekeeper in allowing individuals to work who were not in good standing with the union.

■ It was entirely fortuitous that Fiorino's failure to check cards as timekeeper did not result in the distribution of work to carpenters who were excludable. In light of this, and the fact that Fiorino was derelict in

---

17. Appellants insist that Prunesti defrauded Fiorino and the union by presenting a false, seemingly legitimate work card. The IRO questions the veracity of this proposition. Either way, the fact is immaterial. Fiorino was disciplined for neglecting to check work cards, not for accepting false ones. None of the other five listed individuals are claimed to have obtained work at the Javits Center by presenting false cards. So even if Fiorino was defrauded by Prunesti, that fact would not exculpate him. He could still be disciplined for giving referrals to the other individuals, all of whom were excludable under federal labor law.

382

performing his duties as District Council representative, I uphold the punishment imposed by the Panel under Charge Six: a five-year suspension from union membership.

*Charge Seven:*

 Charge Seven, which the Panel found was proved, alleges:

> You violated your Obligation by falsely representing your qualifications for Union membership,
>
> TO WIT, on or about October 22, 1982, you stated on your application for membership in the United Brotherhood of Carpenters and Joiners that you had worked at the trade for four years, when, in fact, you knew that statement to be false.

On his application for union membership, Fiorino was asked "How many years have you worked at the trade?", to which he replied "4 yrs." IRO Exhibit 36. Directly above Fiorino's signature on the application appears the following oath: "I ... agree that if it is found at any time that I have made false statements of any kind in this application, that my membership shall be declared void and all monies paid by me shall be forfeited." *Id.* The only question then, is whether there is substantial evidence to support the Panel's finding that Fiorino knowingly misrepresented his carpentry experience when he stated on his application that he had "worked at the trade" for four years. I answer the question in the affirmative.

In ruling against Fiorino on Charge Seven, the Panel relied upon Fiorino's own deposition and hearing testimony concerning his carpentry experience prior to applying for membership in the union. The Panel stated:

> Fiorino's testimony at his pre-hearing deposition, echoed at the hearing, was that he had always enjoyed doing carpentry work, and since he was 14 or 15 years old had done favors for people in the neighborhood by doing things such as finishing basements and building porches. He provided no other specifics. It was, he testified, that experience which he was referring to when he answered the question.

Decision at 31–32. This is a fair characterization of Fiorino's testimony. At his deposi-

tion, Fiorino could not recall the name of any carpentry company for which he had worked prior to filling out the membership application in 1982. Deposition Tr. at 413. He testified that his experience consisted almost exclusively of "private" work: non-paid carpentry favors for family and friends. *Id.* at 414–15. Fiorino's testimony before the Panel echoed his earlier testimony. Fiorino stated:

> I applied for a job of which I had plenty of experience because from when I was about 14, 15, I was doing construction my whole life, basements, ceilings, cabinets, trim, decks, forms. I always enjoyed—enjoyed work with my hands, especially when it came to carpentry and other types of construction.

Tr. at 1440. The extensive experience of which Fiorino boasted was, he conceded, acquired through odd jobs for members of his family and the surrounding community. Tr. at 1441–42.

The Panel concluded that Fiorino's self-styled description of his carpentry experience did not constitute "work at the trade," as that phrase was used on the membership application. In the Panel's view, the phrase connoted "regular employment in carpentry work," not "hobby-like carpentry." Panel Decision at 32. The Panel found support for its view in the words of the General President of the Union, who construed the phrase in the following terms in determining that Lenard Simon had similarly lied on his application:

> As indicated, the question before this Union is whether it was a false statement to state on your September 1987 application for membership in the Carpenters Local 30 that you "worked at the trade" for 5 years. Your sworn testimony in both the June 24 and November 14 depositions confirms that you had not been employed as a carpenter prior to September 1987, much less worked at the trade for the 5-year period stated on your application. Driving taxicabs, being a do-it-yourselfer or generally good with one's hands, or *helping out friends and relatives with home improvement projects as a 15-year old,* is not working at the trade, regardless of wheth-

er it might indicate some aptitude to obtain work at the trade. The simple and correct answer to the question on your 1987 application would have been that you had not worked at the trade.

Decision at 32 (emphasis added).

On appeal, Fiorino contends [18] that "he had performed all levels of carpentry for the period time [sic] that he represented on his application." Fiorino's reply brief at 21. He directs the Court's attention to expert testimony attesting to the fact that he was a competent and knowledgeable carpenter at the time he answered the question, and that his answer "was truthful under the acceptable definition utilized in the trade." *Id.* As noted *supra*, however, it is not this Court's province to reweigh the evidence; rather, the Court's task is to determine whether adequate evidence supports the Panel's decision. The Panel relied on the words of the union's General President as opposed to those of the outside experts in deciphering what was meant by the phrase, "work at the trade." I will not second guess that seemingly sound judgment on this appeal. Nor do I see any reason to upset the Panel's sensible finding that under the General President's construction of the phrase, and Fiorino's own description of his carpentry experience at the hearing and pre-hearing deposition, the answer provided by Fiorino on the application was a knowing falsehood.

Accordingly, the Panel's finding on Charge Seven is affirmed.

*Charge Eight:*

The eighth and final charge against Fiorino is framed in the following terms:

You violated the AFL–CIO resolution regarding invocation of the Fifth Amendment, your Obligation, Section 20(B) of the District Council By–Laws and Addendum, and Article V, Section 1 of the Constitution and By–Laws of Local Union 257, by engaging in improper conduct, committing an offense discreditable to the Union, and invoking your Fifth Amendment privilege against self-incrimination while an officer of the Union,

TO WIT, in or around July 1991, while a member and elected officer of Local Union 257, which is affiliated with the AFL–CIO pursuant to Section 58 of the Constitution of the United Brotherhood of Carpenters and Joiners of America, you entered into a stipulation with the Government in *United States of America v. District Council of New York City and Vicinity of the United Brotherhood of Carpenters, et al.,* 90 Civ. 5722 (CSH), in which you declared that you would decline to answer questions or produce documents on the basis of your privilege against self-incrimination with regard to the following matters, among others: the complaint in the above-referenced action, your sources of income, your receipt of gifts from persons involved in the construction industry, your association with known members of La Cosa Nostra, and the employment of Genovese Crime Family members and associates at the Javits Center.

The issue before the Panel, then, was whether Fiorino's invocation of his Fifth Amendment rights in the civil RICO action before this Court constituted a violation of an AFL–CIO Codes of Ethical Practices ("AFL–CIO Codes") Resolution and/or the District Council By–Laws and local Constitution. After conducting a three-tiered analysis, the Panel answered this question in the affirmative. Citing *United States v. IBT ("Parise"),* 777 F.Supp. 1133 (S.D.N.Y.1991), the Panel first found that an AFL–CIO Codes Resolution which provides that if a trade union official "decides to invoke the Fifth Amendment for his personal protection and to avoid scrutiny . . . into alleged corruption on his part, he has no right to continue to hold office in his union," IRO Exh. 40 at 13, applied to officials of the District Council and its constituent locals. Thus, it applied to Fiorino who, at the time he asserted his Fifth Amendment right, was warden of Local 257. Alternatively, the Panel found that the language of the resolution was "germane" to the question of whether Fiorino violated the District Council By–Laws or local Constitution. Next, the Panel declined to credit Fiorino's testimony that he had refused to testify in

---

**18.** The District Council does not challenge the Panel's findings with respect to Charge Seven.

order to save himself the time, expense and stress associated with the ordeal, rather than to avoid scrutiny into his past union-related conduct. Finally, the Panel rejected Fiorino's contention that he had absolved himself of any past wrongdoing by agreeing to testify before the IRO three years after invoking his Fifth Amendment privilege. With these findings, the Panel unanimously concluded that the Charge was proved. A Panel majority imposed on Fiorino a two-year suspension from union membership and a lifetime ban on holding any elected or appointed office in the union.[19]

■ The District Council first contests the Panel's conclusion that the AFL–CIO Codes applied to Fiorino in his capacity as warden of Local 257. Relying principally on the testimony of Donald Sapir, the District Council contends that the record does not support such a conclusion. Sapir testified that the AFL–CIO Codes is binding upon members of international unions that are affiliated with the AFL–CIO. The District Council, Sapir testified, is not an international union. Rather it is entity subordinate to the United Brotherhood of Carpenters and Joiners of America ("UBC")—the "grand daddy" international as Sapir put it—and acts as an intermediary between the international and several locals. Tr. at 877–80. The UBC is affiliated with the AFL–CIO, as are its subordinate bodies, including the District Council and its various constituent locals. See Section 58 of the Constitution of the United Brotherhood of Carpenters and Joiners of America, IRO Exhibit 42, at 89.

Despite Sapir's concession that affiliated internationals are bound by the AFL–CIO's Codes, the District Council claims that neither it nor its constituent locals, all of which are themselves affiliated with the AFL–CIO, are bound by it because they are not international bodies. The District Council seems to think that the Panel was required to accept the testimony of Donald Sapir—the District Council's outside counsel—attesting to this distinction between officials of international

and domestic AFL–CIO affiliates. But I think the Panel acted well within its discretion in implicitly rejecting the distinction, which on its face appears arbitrary, and is unsupported by additional record evidence. Indeed, the view of the District Council runs counter to the language of the resolution itself, which subjects all "trade union officials" to its mandate, not just those who represent international affiliates. IRO Exh. 40 at 13.

In any event, I think the issue is of little importance. Fiorino was charged with violating the union rules as well as the AFL–CIO Codes. Thus, the Panel could find that Charge Eight was proved even if, strictly speaking, the Codes Resolution did not apply to Fiorino. The underlying question was whether Fiorino's refusal to testify was an offense "discreditable" to the union, such that it violated the District Council By–Laws and local Constitution. Apparently cognizant of this inquiry, the Panel wrote that the AFL–CIO Codes was "certainly germane to the question of whether Fiorino's conduct was such to bring discredit upon the Union." Decision at 33.

The District Council turns a blind eye to this aspect of the Charge in arguing that the Panel's reliance on Parise was misplaced. In that case, the Investigation Officer charged Parise, an officer of IBT Local Union 473 and Joint Council 41, with violating the IBT Constitution by refusing to answer questions regarding his allegedly corrupt activities in the Union. Like the UBC, the IBT is an international union affiliated with the AFL–CIO. Thus, the Independent Administrator in that case found that Parise had violated the IBT Constitution as well as the AFL–CIO Codes by invoking his Fifth Amendment rights. Parise appealed to the district court, arguing, much as the District Council does in this case, that he could not be disciplined for violating the AFL–CIO Codes. The court thought this to be immaterial, writing:

"[t]here is no authority for fining, suspending or expelling a person from a union for asserting the privilege." Barth Opinion at 9. Thus, in his view, the 24–month suspension on Fiorino's membership was inappropriate.

---

**19.** In his concurrence and dissent, Mr. Barth viewed this punishment as too severe. He recommended that Fiorino be banned from holding union office for three years, rather than for the rest of his life. In addition, he stated that

The fundamental flaw with Parise's argument is that he was not disciplined for violating the AFL–CIO Code of Legal Practices, but was disciplined for violating Article II, Section 2(a) and Article XIX, Section 6(b) of the IBT Constitution by conducting himself in a manner bringing reproach upon the Union. The Independent Administrator specifically considered the AFL–CIO Code within the parameters of the IBT Constitution, and found the Code to be probative in the context of considering whether Parise violated his oath of office.

777 F.Supp. at 1138.

The case at bar is directly analogous to *Parise:* Parise and Fiorino were both officers of constituent locals charged with violating similar provisions in their respective union constitutions by invoking their Fifth Amendment rights. The Panel was therefore justified in relying on the *Parise* court's reasoning in deciding the relevant weight to attach to the AFL–CIO Codes. Essentially, the Panel followed the course taken by the Independent Administrator and upheld by the district court in that case: it considered the AFL–CIO Codes to be "within the parameters" of the District Council By–Laws and local Constitution, and also found it "probative" in determining whether Fiorino had engaged in improper conduct and committed an offense discreditable to the union under those union documents.

I agree with the district court in *Parise* that this approach is neither arbitrary nor capricious. Whether or not the record evidence supports the Panel's finding that Fiorino is technically bound by the AFL–CIO Codes, the Panel did not act unreasonably in finding that a refusal to testify in order to avoid inquiry into corrupt union activities constitutes a distinct violation of the District Council By–Laws and local Constitution, and that the AFL–CIO Codes was "germane" in coming to this conclusion.

 Appellants next attack the Panel's conclusion that Fiorino invoked his right against self-incrimination in order to evade scrutiny, as is prohibited by the AFL–CIO Codes. At the hearing, Fiorino testified that he invoked his Fifth Amendment right in order to avoid the hassle and expense associated with testifying. The Panel viewed "Fiorino's testimony on this issue with considerable skepticism, since the day after he invoked the privilege, Fiorino resigned as warden of Local 257." Panel Decision at 34. The Panel continued: "[t]he timing could be coincidental, but we find an awareness on Fiorino's part that he could no longer hold Union office." *Id.*

Appellants contend that had Fiorino actually been aware of the rule against local officers invoking their Fifth Amendment rights, he would have resigned as warden prior to refusing to testify. In this way, he could have avoided any sanction arising from that refusal. The IRO counters that Fiorino could not have craftily skirted his obligations as an officer of the Union by resigning, invoking the privilege, and then later reasserting his officer duties once he was no longer the subject of a government investigation.

Whether Fiorino could have avoided union discipline by resigning prior to invoking his Fifth Amendment right is beside the point. The question is simply whether Fiorino's decision to resign after invoking the privilege reflected his reasons for refusing to testify. The Panel apparently felt that it did, stating that this decision reflected an awareness on Fiorino's part that he could no longer hold union office. I share the appellants' skepticism toward this line of reasoning. To say that Fiorino tendered his resignation so as to effectively sanction himself for violations of the District Council By–Laws and local Constitution seems to me a bit strained. That, however, does not mean that the resignation reveals nothing about Fiorino's intentions. I think it likely that Fiorino's decision to resign was an attempt to dissuade further government scrutiny by voluntarily relinquishing a position of authority in the Union. If that was in fact the case, then it would be reasonable to assume that Fiorino's unwillingness to testify, expressed the day before his resignation, was driven by a similar motivation.

 Even setting this thinking aside, there is a separate reason why I think the Panel acted reasonably in rejecting Fiorino's explanation for his refusal to testify. This

has to do more with the nature of the Fifth Amendment privilege itself, than with Fiorino's subjective state of mind at the time he invoked the privilege. The privilege insulates witnesses against the dangers of self-incrimination, not the hassle, stress or expense associated with testifying. Thus, to properly invoke his Fifth Amendment right in the civil RICO case, Fiorino had to be doing so because he feared his testimony might tend to implicate him criminally, not because of other costs, monetary or otherwise, associated with giving testimony. Stated another way, the only conceptual basis for Fiorino's invocation of the Fifth Amendment was to avoid further scrutiny into his own union-related criminal activities. Thus, Fiorino will not now be heard to say that he invoked the privilege in order to avoid the inconveniences of testifying. Were that in fact the case, Fiorino had no constitutional right to assert the privilege in the first place.

In addition, Fiorino's self-serving testimony concerning his reasons for asserting the privilege is inherently unreliable. It is hard to believe that Fiorino refused to testify about his sources of income, his alleged receipt of bribes, his alleged association with members of La Cosa Nostra, and his alleged employment of organized crime members at the Javits Center because it would be burdensome to do so. It is far more likely that his refusal stemmed from a concern about the criminal consequences that might derive from that testimony. The Panel seemed to recognize this when it stated:

> We find Fiorino's explanation unpersuasive. Moreover, given our findings on some of the other allegations, we conclude that Fiorino was invoking the Fifth

Amendment privilege to shield his conduct from scrutiny.

Decision at 34. I do not think that this credibility assessment was at all arbitrary and capricious. I therefore decline to disturb the Panel's holding that Fiorino invoked his Fifth Amendment right to stymie governmental scrutiny into his alleged corruption.[20]

Appellants argue that even if Fiorino's refusal to testify was violative of the District Council By-Laws and local Constitution, he absolved himself of that misconduct by agreeing to testify before the IRO at a pre-hearing deposition. The Panel rejected this argument, reasoning that

> this occurred some three years after the invocation. In the interim, the civil RICO lawsuit, the proceeding at which Fiorino refused to testify, was settled. Fiorino's unwillingness to testify during that proceeding, and whatever effect that had on the resolution of that case, cannot be negated by his testimony three years later during a different proceeding.

Panel Decision at 34. In support of its conclusion, the Panel cited *United States v. 4003–4005 5th Ave., Brooklyn, NY (Mendez)*, 55 F.3d 78 (2d Cir.1995).

The District Council expends significant effort distinguishing the facts of *Mendez* from the present case. I need not entertain these arguments, however, for I view the case as legally inapposite to the one at bar: the issue before the Second Circuit in *Mendez* was entirely different from the one before the Panel. In *Mendez*, the Court considered the circumstances under which a civil litigant can invoke his Fifth Amendment privilege, and then withdraw it later, so that he can explain his side of the story to the

---

**20.** The District Council also contends that whether or not Fiorino invoked his Fifth Amendment rights to evade scrutiny, he cannot be disciplined for this conduct because the government's inquiry would not have had any relation to his official duties as warden. I do not see, and the District Council does not explain, why this fact is relevant. The AFL–CIO Codes prohibits officers from refusing to testify in order "to avoid scrutiny ... into alleged corruption on [their] part," not simply to avoid scrutiny into the proper performance of their official duties. As noted in text, the Panel properly relied on the AFL–CIO Codes in concluding that the District Council

By-Laws and local Constitution prohibited similar conduct. Thus, the prohibitions of the Codes and the union authorities are broader than the District Council suggests. At the same time, however, the Panel's decision does not hold that an officer is "absolutely prohibited from invoking the Fifth Amendment privilege on *any* subject," as the District Council would have the Court believe. District Council Memorandum at 42 (emphasis in original). Rather, as the above excerpt from the AFL–CIO Codes unambiguously indicates, a union official is simply prohibited from invoking the privilege to evade inquiry into labor-related corruption on his part.

court. The Second Circuit held that courts should view such applications for withdrawal "liberally." 55 F.3d at 84. However, "if the litigant's request to waive comes only at the 'eleventh hour' and appears to part of a manipulative, 'cat-and-mouse approach' to the litigation, a trial court may be fully entitled, ... to bar a litigant from testifying later about matters previously hidden from discovery through an invocation of the privilege." *Id.* at 85.

Here, the issue before the Panel was not whether Fiorino had a right testify before the IRO after invoking the privilege three years earlier. Rather, the Panel was confronted with the question of whether the waiver, once given, vitiated Fiorino's prior violation of union rules, that is, whether it "absolved the taint of the invocation." Decision at 34. *Mendez* does not speak to this issue, and the Panel's reliance on it was misplaced.

The error, however, was harmless. Completely independent of anything the Second Circuit may have said in *Mendez,* the Panel concluded that Fiorino should not be allowed to evade discipline for invoking his Fifth Amendment right by agreeing to testify before the IRO some three years after the invocation, and long after the consent decree had been executed in connection with the underlying civil RICO case. That conclusion is a sensible one. Fiorino's contention that at the time he invoked his Fifth Amendment right, he did not know that such conduct constituted a violation of the District Council By–Laws and local Constitution, and that once he realized that the IRO regarded it as such, he agreed to testify, does not have the ring of truth. Rather, it is far more likely that Fiorino agreed to testify at the prehearing deposition before the IRO in order to preserve his right to tell his side of the story at the hearing before the Panel, or perhaps to convince the IRO to drop the charges. In light of this, and the fact that three years had passed and circumstances had altered so dramatically by the time Fiorino finally agreed to answer questions about his conduct, I do not think it was error for the Panel to conclude that his deposition

testimony did not eradicate the taint of the prior invocation.

■ I now turn to the appellant's final argument: that the punishment imposed by the Panel majority on Fiorino for invoking his Fifth Amendment right was too severe. As with other Panel decisions, the Panel's determination of an appropriate penalty is entitled to "great deference," and should only be disturbed if it was arbitrary and capricious. *United States v. IBT,* 824 F.Supp. at 418, *aff'd* 19 F.3d 816 (2d Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 199, 130 L.Ed.2d 130 (1994); *see also United States v. IBT ("Sansone"),* 981 F.2d 1362, 1371–72 (2d Cir.1992).

■ In arguing that the penalty imposed on Fiorino under Charge Eight was so harsh as to be "arbitrary and capricious," the District Council places principal reliance on language in the AFL–CIO Codes resolution which states that an officer who commits such a violation "has no right to continue to hold office in his union." IRO Exh. 40 at 13. In the District Council's view, this language means that an officer who violates the resolution will be ousted from office, but retains the right to hold a duly-elected position at a later time. Thus, the District Council continues, the permanent ban precluding Fiorino from ever holding office again was too severe.

The District Council's interpretation of the AFL–CIO Codes resolution is strained at best. But it is of no consequence, since the Panel was not bound by the terms of that resolution in fixing the appropriate penalty. The fact that the Panel found guidance in the AFL–CIO resolution in determining that Fiorino had violated his constitutional obligations as a union officer does not mean the Panel was obliged to rely on it in setting a proper punishment. Nor was the Panel compelled to impose the same 24–month ban on Fiorino that the Independent Administrator imposed on Parise in the *Parise* case, as the District Council implies in its memorandum of law. To the contrary, the Panel had wide discretion in imposing a punishment which fit its view of Fiorino's culpability and the surrounding circumstances. *See* 824 F.Supp. at 410 ("The Independent Administrator is best

equipped to evaluate the demeanor, credibility and, ultimately, the culpability, of those who appear before him.... It follows that he is also uniquely situated to choose an appropriate penalty.").

The District Council does not suggest, and I cannot discern, any other reason why the Panel exceeded its discretion in setting the punishment for Charge Eight. The Panel carefully considered the evidence, and thought that a lifetime ban was appropriate given the nature of Fiorino's conduct. That determination was by no means arbitrary and capricious.

I therefore affirm the Panel's conclusion that Charge Eight was proved, and uphold the punishment imposed for that misconduct.

## V

For the foregoing reasons, the Panel's findings and conclusion are affirmed in part and reversed in part.

The remedies crafted by the Panel majority are affirmed.

It is SO ORDERED.